59 A.3d 509

**Andre BOURGEOIS, Individually and on Behalf of a Class of Others Similarly Situated**

v.

**LIVE NATION ENTERTAINMENT, INC., et al.**

Misc. No. 8, Sept. Term, 2012.

Court of Appeals of Maryland.

Jan. 18, 2013.

Martin E. Wolf (Benjamin H. Carney and Richard S. Gordon (Gordon & Wolf, Chtd., Baltimore, MD)), on brief, for appellants.

Patrick J. Carome (Brent R. Bickley of Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC; Lawrence J. Quinn and Kelly M. Marzullo of Tydings & Rosenberg LLP, Baltimore, MD), on brief, for appellees.

Turner D. Madden, Madden & Patton, LLC, Washington, DC, for amici curiae brief of The International Association of Venue Managers, The Baltimore Ravens Limited Partnership, and The Baltimore Orioles Limited Partnership in Support of Appellees.

Argued before BELL, C.J., HARRELL, GREENE, ADKINS, BARBERA, McDONALD and ALAN M. WILNER (Retired, specially assigned), JJ.

WILNER, J.

Before us are four questions certified to this Court by the United States District Court for the District of Maryland pursuant to the Maryland Uniform Certification of Questions of Law Act (Md.Code, §§ 12–601–12–613 of the Courts and Judicial Proceedings Article (CJP)). Those questions arise from a class action pending in the District Court in which the defendants are alleged to have violated Baltimore City ordinances dealing with the sale of tickets to certain entertainment and sports events that take place in the City.

## BACKGROUND

### The Federal Action

The defendants in the Federal action are (1) Lyric Productions LLC, which operates the Modell Performing Arts Center at the Lyric Opera House in the City (Lyric), and (2) certain entities, which for convenience we shall collectively call Ticketmaster, that, pursuant to agreements with Lyric (and other entities licensed to conduct entertainment or sports events in the City), sell tickets to those events, online, by telephone, and through outlets, and charge the customer more than the price printed on the ticket. The additional amount is denoted in the agreement with Lyric as a "service charge."

The plaintiff, Mr. Bourgeois, purchased online from Ticketmaster a ticket to a concert held at the Lyric in November 2009. The price printed on the ticket that Mr. Bourgeois received was $52. To that amount, Ticketmaster added a "service charge" of more than $12.[1] It is asserted, and so far not disputed, that Mr. Bourgeois was informed of that charge before deciding to purchase the ticket from Ticketmaster and knowingly decided to proceed. He received the ticket and attended the concert. Two years later, on behalf of himself and a proposed class of others similarly situated, he filed this action challenging the legality of Ticketmaster's collection of the service charge.[2] That challenge is based on Art. 15,

---

**1.** Based on the pleadings in the case, the District Court stated in its Certification Order that "because Mr. Bourgeois purchased the ticket via Ticketmaster's website, he was charged *more than* $12 in additional 'service charges.'" (Emphasis added). As will be explained, the Facility Agreement between Ticketmaster and Lyric permits Ticketmaster to charge "a per ticket convenience charge, a per order 'order processing' fee and, if applicable, a premium delivery charge," as well as a "facility fee," most of which it remits to Lyric. It is not clear from the record before us how much Mr. Bourgeois actually paid for the ticket or how the total amount over the $52 was allocated among the various fees Ticketmaster was allowed by the Facility Agreement to collect.

**2.** The action was filed initially in the Circuit Court for Baltimore City but was removed by the defendants to the U.S. District Court.

§§ 21–1 through 21–5 and Art. 19, § 55–1 of the Baltimore City Code. The complaint contains nine counts, one of which (Count I) is the "common count" for money had and received.

### The Ordinances

Article 15, subtitle 21 of the 2000 version of the City Code regulates the sale of tickets to certain licensed events in Baltimore City, both by the entity putting on the event, such as Lyric, and by certain ticket agencies that also sell tickets to those events. The subtitle consists of five sections— §§ 21–1 through 21–5. Section 21–1 is a licensing provision. It states, in relevant part:

### § 21–1. License required

(a) *In general*

No person shall engage in the business of selling tickets ... evidencing the right of admission to exhibitions, performances, games, or sports conducted by licensees under licenses issued by the State of Maryland or City of Baltimore ... unless a license shall have been issued to such persons by the Director of Finance upon the payment of the fee herein prescribed.

(b) *Exception*

Provided, however, that no license shall be required of any agent duly authorized in writing by a licensed exhibitor to sell tickets for said licensee at the **established price** printed thereon.

(c) *Scope; term; fee*

(1) Each such license shall be limited to a single location or place of business and shall expire on January 1 next ensuing the grant thereof.

(2) The fee for such a license shall be $250 and the said license fee shall not be prorated.

(Bolding of text added)

Sections 21–2 through 21–5 are regulatory statutes. In pertinent part, they provide as follows:

### § 21–2. Maximum service charge

A licensee under this section, or any officer or employee thereof, shall not directly or indirectly exact, accept, or receive for any ticket or token of admission to an exhibition, performance, game, or sport conducted by a licensee under a license granted by the State of Maryland, or the City of Baltimore, any greater amount than 50¢ in excess of the sum of the **regular or established price or charge** therefor printed on the face of such ticket, plus the amount of any tax imposed by the Government of the United States or by the State of Maryland upon such ticket or the right of admission thereunder.

(Bolding of text added).

### § 21–3. "Scalping" prohibited

(a) *Price to be on ticket*

Whenever the right of admission to any licensed exhibition or performance or to any game or sport where a charge is made is evidenced by a ticket ... the **regular or established price or charge** therefor shall be conspicuously printed thereon.

(b) *Sale for more prohibited; penalties*

(1) If such licensee, or any of his officers or employees, shall exact, accept, or receive, directly or indirectly, any greater amount than such **regular or established price or charge,** plus the amount of any tax imposed by the Government of the United States or the State of Maryland:

(i) the license of such licensee may be revoked and annulled; and

(ii) such licensee, officer, or employees shall be guilty of a misdemeanor and, upon conviction thereof, shall be subject to a fine of not more than $500 for each such violation.

(2) The sale of each ticket in violation thereof shall constitute a separate offense.

(Bolding of text added).

Section 21–4 permits the Director of Finance to revoke the license issued under the subtitle for any violation of the

subtitle. Section 21–5 makes it a misdemeanor, subject to imprisonment for six months and a $500 fine for any person to engage in the business without a license.

Article 19 of the City Code contains what the Code calls "Police Ordinances." Subtitle 55 deals with ticket sales. Sections 55–1(a) and (b), under the caption "Ticket scalping," provide:

(a) *Prohibited conduct.*

It shall be unlawful for any person ... to sell or exchange, or offer to sell or exchange, for more than the **price stated thereon** or for remuneration in any form greater than such price, any ticket or tickets for admission to a public amusement, athletic, educational, or other event in the City of Baltimore.

(b) *Exception*

Nothing in this section shall be construed to make illegal or invalidate the excess sum which is permitted to be charged for certain tickets by a person engaged in the business of selling tickets under the provisions of Article 15, Subtitle 21 {"Ticket Agencies"} of the City Code.

(Bolding of text added).

Section 55–1(c) makes a violation of the section a misdemeanor, subject to a fine of $1,000 for each ticket sold or exchanged, or offered to be sold or exchanged, in violation of the section.

### The Facility Agreement

Ticketmaster and Lyric are parties to a Facility Agreement, under which, in relevant part:

(1) Lyric granted to Ticketmaster "exclusive Outlet Sales and Telephone Sales rights for all Events." Under the definitions of those terms, that gave Ticketmaster the exclusive right to sell tickets through outlets other than Lyric, by telephone, over the Internet, and by other electronic means to all events held at Lyric, other than performances by the Baltimore Opera.[3] Lyric retained the exclusive right to sell

---

**3.** In Exhibit A to the Agreement, "Outlet Sales" was defined as "the sale of Tickets for an Event at locations other than the Facility Box

tickets to its events to persons who appear personally at its box office (Facility Box Office Sales), although it utilizes Ticketmaster's ticketing system to conduct those sales.

(2) With respect to tickets it sells, Ticketmaster is "authorized" to collect, in addition to the price established by Lyric and printed on the ticket, a service charge and certain other charges.[4] Section 5(B) of the Facility Agreement authorizes Ticketmaster to "impose a per Ticket Service Charge on all Outlet Sales and Telephone Sales." The service charge on telephone sales must "include a per order handling fee." The amount of the service charges, including the handling fee "shall be determined solely by [Ticketmaster]" and may be increased from time to time.

(3) Section 2 of Exhibit A to the Facility Agreement provides further detail regarding service charges. It requires that "[a]ll Tickets to an Event sold through Outlet Sales or Telephone Sales shall be sold at the Gross Ticket Price." "Gross Ticket Price" is defined as "the purchase price for a Ticket for an Event, as established by Principal or the Promoter of the Event (Lyric), plus all taxes and other charges paid by the Ticket purchaser, including the Service Charge and per Ticket credit card surcharge if applicable."[5] To close the loop, "Service Charge" is defined as "the amount charged by [Ticketmaster]· to Ticket purchasers for the use of the

---

Office, but excluding Telephone Sales." "Telephone Sales" was defined as "the sale of Tickets for Events by means of any form of electronic communications, including, but not limited to, one or more of the following, at [Ticketmaster's] option: telephone, the Internet, 'smart telephones,' voice response units, or comparable computerized communications devices."

**4.** We use the word "authorize," in its various tenses, in this part of the Opinion merely to describe the contractual terms, not as an indication of their validity.

**5.** Section 5(C) of the Facility Agreement provides that Lyric "shall be solely liable for, and shall pay as required, all amusement taxes or any other tax or fee obligation associated with the sale of Tickets or related activity conducted pursuant to the Agreement." Ticketmaster recommended but did not require that Lyric include such obligations in the price of the ticket.

System, including per Ticket charges and per order charges." "System" means "the equipment, software and procedures established and maintained by [Ticketmaster] for the purpose of selling, auditing and controlling the sale of Tickets for Attractions."

(4) For each Lyric-event ticket sold by telephone or other electronic means, or through an outlet other than Lyric, Ticketmaster remits to Lyric the entire amount of the face value of the ticket plus, pursuant to a provision in Rider C to the Facility Agreement, a designated portion of the service charge Ticketmaster collects, which the Rider refers to as a "rebate." [6] The fact that a portion of the "service charge" collected by Ticketmaster is rebated to the Lyric is not advertised or revealed to the ticket buyer.

(5) The Lyric box office is a Ticketmaster outlet. Although Lyric does not collect a Ticketmaster service charge for tickets sold at its box office for its own events, Lyric uses the Ticketmaster system to sell tickets for events at other venues, including those in Baltimore City, for which it does collect service charges on Ticketmaster's behalf.

(6) Although not specifically mentioned in the Certification Order or in the plaintiff's complaint, the defendants note in their brief that, for many years, Lyric has collected on its box office sales a "facility fee" of up to three dollars that is not reflected in the price printed on the ticket. They thus contend that, had Mr. Bourgeois purchased his ticket from the Lyric at its box office, he would have paid the $52 plus the three dollar facility fee. Rider D to the Facility Agreement deals with facility fees, but in a different context. It permits a facility fee of three dollars to be included in the *gross price* of tickets sold by Ticketmaster, and, if it is so included, the Rider requires Ticketmaster, in its telephone and outlet sales, to collect that fee on behalf of Lyric. The facility fee is *not* part

---

**6.** The amount that is rebated to Lyric is provided for in a Rider to the Facility Agreement. The Rider is included in a sealed portion of the Appendix filed by the parties. The amount is not important to the issues before us.

of the Ticketmaster service charge, however; after deducting a processing fee of 50¢ per ticket, Ticketmaster must remit the balance of the facility fee ($2.50) to Lyric.

(7) From all of this, it seems apparent that, on all telephone and outlet sales, both Ticketmaster and Lyric receive an amount of money in excess of the price stated on the ticket (and, indeed, in excess of 50¢ more than the price stated on the ticket) and that it also may be the case, even on box office sales of tickets by Lyric to its own events, that Lyric receives a sum greater than the price stated on the ticket.

(8) The parties have advised the Court that major features of the foregoing arrangement, including both the collection of service charges by Ticketmaster of far more than 50¢ per ticket and the collection of facility fees by or on behalf of the licensed venue (which the parties refer to as the "exhibitor,") are common in Ticketmaster contracts, including those with venues in Baltimore City owned and operated by agencies of the State of Maryland and the City of Baltimore.[7]

## *CERTIFIED QUESTIONS*

With this background, the District Court has certified the following questions:

(1) Where a ticket agency is authorized in writing by a licensed exhibitor to sell tickets to an event, and the ticket agency collects both the established price printed on the ticket and an additional, separately-stated per-ticket service charge that would not be charged as part of the established ticket price when tickets are sold directly by the exhibitor, does the exception contained in Article 15, § 21–1(b) of the Baltimore City Code apply, so as to exempt the ticket agency from the requirement of licensure, *see id.* § 21–1(a),

---

**7.** Without contravention, the defendants claim that facility fees are collected on both Internet and box office sales by the First Mariner Arena, which is owned by Baltimore City, and the France–Merrick Performing Arts Center (the Hippodrome), which is owned by the Maryland Stadium Authority, a unit of the State Government.

and from the limitation of maximum service charges, *see id.* § 21–2?

(2) Does Article 19, § 55–1(a) of the Baltimore City Code prohibit the collection of a service charge, in addition to the established price printed on a ticket in connection with the original sale of the ticket by the exhibitor or the exhibitor's authorized agent? Or, instead, does § 55–1(a) apply only to ticket resales?

(3) If Article 19, § 55–1(a) applies to original ticket sales, does the exemption contained in § 55–1(b) apply, so as to allow a seller of tickets to charge a per-ticket service charge in addition to the established price printed on the ticket, where the seller is not licensed under Article 15, § 21–1(a), and the service charge exceeds the maximum service charge permitted under § 21–2, but the seller is exempt from licensure under § 21–1(b)?

(4) Does Maryland recognize a common-law cause of action for money had and received and, if so, may a claim for money had and received be maintained to recover money collected in violation of the above-referenced Baltimore City ordinances?

## DISCUSSION

### Preliminary Considerations

Laws generally similar to the ordinances now before us— requiring the price of tickets to sporting and entertainment events to be printed on the tickets and, with exceptions or allowances of one kind or another, prohibiting the sale or resale of such tickets at more than that price—are not uncommon. At least eight States have Statewide laws to that effect, and it is likely that similar laws also exist at the local level.[8] The State laws differ somewhat in their details, and all were

---

8. *See* La. R.S. 4:1 (Louisiana); 4 P.S. § 211 and 5 Pa.C.S. § 1111 (Pennsylvania); MCLS § 750.465 (Michigan); N.J. Stat. § 56:8–33 (New Jersey); A.C.A. § 5–63–201 (Arkansas); ALM GL ch. 140 § 185D (Massachusetts); N.C. Gen.Stat. § 14–344 (North Carolina); 815 ILCS 414/1.5 (Illinois).

enacted or amended after the enactment of the Baltimore City ordinances and thus tend to take greater account of current marketing norms. Although they may have marginal relevance to some of the issues before us, our focus is on the Baltimore City ordinances.

■ The controlling issue with respect to the first three certified questions is one of statutory construction, the rules of which have been stated and restated many times, not always, unfortunately, with rigid consistency. Although we are dealing with municipal ordinances, we apply the same rules of construction with respect to them as we do for State statutes. *120 W. Fayette v. Baltimore*, 413 Md. 309, 331, 992 A.2d 459, 472 (2010); *Foley v. Hovnanian*, 410 Md. 128, 145–46, 978 A.2d 222, 233 (2009); *O'Connor v. Baltimore County*, 382 Md. 102, 113, 854 A.2d 1191, 1198 (2004).

■ The basic rules were most recently summarized and confirmed in *Miller v. Mathias*, 428 Md. 419, 450–51, 52 A.3d 53, 72 (2012), *Montgomery Co. v. FOP Lodge 35*, 427 Md. 561, 572, 50 A.3d 579, 585–86 (2012), and *Gomez v. Jackson Hewitt*, 427 Md. 128, 159–60, 46 A.3d 443, 461–62 (2012). A court's primary goal in construing statutes is to discern the legislative purpose—the ends to be accomplished, the evils to be remedied. The most common expression of that principle is that we look to the intention of the Legislature "in enacting the statute." *Reier v. Dept. of Assessments and Taxation*, 397 Md. 2, 26, 915 A.2d 970, 984 (2007). That, necessarily, has been construed to mean the intent of the Legislature "at the time it enacted the statute." *McNeil v. State*, 356 Md. 396, 404, 739 A.2d 80, 84 (1999); *In re Adoption No. 12612*, 353 Md. 209, 233, 725 A.2d 1037, 1049 (1999); *Clark v. State*, 348 Md. 722, 726, 705 A.2d 1164, 1166 (1998); *Brown v. State*, 359 Md. 180, 188, 753 A.2d 84, 88 (2000). We thus look at the "ends to be accomplished" or the "evils to be remedied" known to, or at least within the reasonable contemplation of, the legislative body when it enacted the statute. We do not stretch a statute to "express an intention not evidenced in its

original form," *Erwin & Shafer, Inc. v. Pabst Brewing Co.,* 304 Md. 302, 315, 498 A.2d 1188, 1194 (1985).

We begin with the plain language of the statute, reading it as a whole to ensure that no word, clause, sentence, or phrase is rendered meaningless. If the language is clear and unambiguous, we need go no further. In determining whether the language is clear and unambiguous, we interpret each provision in the context of the entire statutory scheme. Statutes must, however, be given a reasonable interpretation, not one that is illogical or incompatible with common sense, and statutes on the same subject are to be read together and harmonized, to the extent possible.

If, through that analysis, we conclude that the statute is subject to more than one interpretation or that relevant terms are otherwise ambiguous, we endeavor to resolve the ambiguity by looking to the statute's legislative history, purpose, and structure, as well as to case law. Legislative history may be considered in an effort both to confirm what appears to be a clear intent from the language itself and to discern legislative intent when that intent is not entirely clear from the statutory language. *Gomez v. Jackson Hewitt, supra,* 427 Md. at 160, 46 A.3d at 462; *Friendly Finance v. Orbit,* 378 Md. 337, 344, 835 A.2d 1197, 1201 (2003); *Pak v. Hoang,* 378 Md. 315, 323, 835 A.2d 1185, 1189 (2003).

Finally, with respect to statutory construction, the first three certified questions hinge primarily on the meaning of the words "established price." Those two words appear in §§ 21–1, 21–2, and 21–3, although each of those statutes includes the words as part of a broader phrase. Section 21–1(b) uses the phrase "established price printed thereon," meaning printed on the ticket. Sections 21–2 and 21–3 use the phrase "regular or established price or charge." Section 55–1 does not use the words "established price" but refers to "the price stated thereon," thereon meaning the ticket.

At oral argument, both the plaintiff and Ticketmaster agreed that, despite the different wording, the terms mean the same thing—the price printed on the ticket—and we shall

accept that construction as reasonable. Their disagreement, and the thrust of at least the first three certified questions, is whether the service charges or other additional amounts charged or collected by Ticketmaster, though not included within the "established price," are nonetheless not precluded by the terms of the ordinances. Ultimately, all three questions hinge on that.

## Question No. 1

*Is A Ticket Agency With Arrangements Similar To Those Between Ticketmaster and Lyric Required to be Licensed Under § 21–1?*

Although the question centers on § 21–1 and, in particular, on § 21–1(b), other provisions of the subtitle have some relevance to the licensing issue.

As noted, § 21–1(a) provides that "no person" shall "engage in the business of selling [ ] tickets" evidencing the right to admission to events "conducted by licensees under licenses issued" by the State of Maryland or the City of Baltimore "unless a license shall have been issued to such persons by the Director of Finance." Section 21–1(b), however, provides that no such license is required "of any agent duly authorized in writing by a licensed exhibitor to sell tickets for said licensee at the established price printed thereon."

Ultimately, of course, the language of those ordinances will determine their meaning. Because the ordinances are more than 60 years old and have never been construed by this Court, however, and because the circumstances offered as justification for Ticketmaster's service changes either did not exist or have changed rather dramatically since the enactment of the ordinances, consideration of the legislative history is useful, in part to expose what the City Council was attempting to address and also to clarify what otherwise might be ambiguous from a later non-substantive reorganization of the ordinances and provide a rationality not otherwise immediately apparent.

What are now §§ 21–1 through 21–5 were first enacted in June 1949 by Ordinance 49–735, which added a new § 18A to Article 25 of the then-current 1927 City Code. The ordinance has an interesting history, some of which has been preserved in the City and State archives and some of which is illuminated by contemporaneous newspaper articles and advertisements.[9]

The initial concern was over ticket scalping, mostly involving the resale of tickets to U.S. Naval Academy football games, both in Baltimore and in Philadelphia. In October, 1947, it was reported that a senior midshipman had been dismissed from the Academy for an accumulation of demerits, most of which he received as a result of obtaining from fellow midshipmen 400 tickets to the upcoming football game between Navy and the University of Pennsylvania and delivering them to one or more persons from Philadelphia for resale.[10] A month later, it was noted that Philadelphia had an ordinance that prohibited the selling of tickets for more than one dollar over the listed price, which was being skirted by selling tickets to the Army–Navy game just outside the city limits.[11]

On Monday, October 25, 1948, as the next Navy football season was in high gear, the City Council, under suspended rules, rushed through in one day a hastily drawn ordinance sponsored by eleven members of the Council, making it a crime to sell, exchange, or offer for sale or exchange any ticket to a football game in Baltimore City for more than the price stated on the ticket. The penalty was $500 for each ticket sold in violation of the ordinance. *See* Ordinance No. 388 (1948).

According to William J. Muth, Vice President of the Council and one of the sponsors of the bill, the ordinance was enacted

---

9. Our reference to some of the newspaper articles is not intended to regard such articles as a reliable indicator of legislative intent, which normally is not the case, but only to note events or circumstances that were publicly reported.

10. *See* Baltimore *Sun,* Oct. 29, 1947, p. 30.

11. *See* Baltimore *Sun,* November 24, 1947, p. 19.

because "Baltimoreans are being deprived of tickets to the Navy–Notre Dame football game [next] Saturday except at exorbitant prices." Muth claimed that there were no tickets available, that scalpers had acquired 4,000 tickets, that the price per ticket would rise to $25 by the end of the week, and that the scalpers stood to make $100,000.[12] There appeared to be a basis for that claim. An article appearing in the Baltimore *News Post* reported that officers of a downtown ticket agency complained that they stood to "lose several thousand dollars" because of the ordinance.[13] An article in the Baltimore *Sun* quoted Max Cohen, apparently the owner of that ticket agency, as complaining that the box office price was $3.75, that he was selling the tickets for five dollars, and that he had sold only 143 tickets.[14] It was reported that tickets were available at the $3.75 price, but no one wanted them because they were in the end zone. The Mayor approved the ordinance the next day, and it took effect immediately.

One day later, on Wednesday the 27th, Mr. Cohen filed suit, claiming that the ordinance was confiscatory, that it deprived him of a lawful return on his property without due process of law, and that it was arbitrary, as it applied only to tickets to football games. The case was heard and decided the following day. In an oral opinion, the court declared the ordinance invalid, and it entered an order enjoining its enforcement. The court held that, while the City Council could regulate the business of reselling tickets by fixing a maximum markup price, the ordinance appeared to be directed at one football game and its thrust was simply to drive football ticket brokers out of business by disallowing them any return on their property.[15]

---

12. *See* Baltimore *Sun*, October 26, 1948, p. 32.

13. *See* Baltimore *News Post*, October 26, 1948, p. 2.

14. *See* Baltimore *Sun*, October 26, 1948, p. 32.

15. *See* Circuit Court No. 2 for Baltimore City (Equity Docket A), Case No. 29751A, Liber 57A, p. 580. *See* also Baltimore *Sun*, October 29,

The City acquiesced in the decision. Councilman Muth acknowledged that the ordinance was hastily drawn and vowed to prepare a new ordinance after research by the City Solicitor and the Department of Legislative Reference and consideration of ordinances in Philadelphia and New York that permitted but regulated the resale of tickets to sporting and entertainment events.[16] Six months later, in January, 1949, Council Bill 1119 was introduced and, unlike Ordinance 388, went through the normal legislative process.

The introductory version of the ordinance apparently was not preserved, but the Journal of City Council proceedings on the bill is available. Unlike the earlier ordinance, this one was not limited to football tickets and it was more than an anti-scalping bill. It established broader regulation of both exhibitors and ticket agencies, provided for the licensing of the latter, and permitted licensed ticket agencies to add a premium of 50¢ on the sale of tickets. In contrast to the earlier ordinance, which was placed in the "Police" title of the 1927 Code under the subtitle "Football Tickets," this one was placed in the "Licenses" title to the 1927 Code, under the subtitle "Amusements."

Subsection 18A(a) dealt exclusively with exhibitors who conducted licensed events and contained the language now found in § 21–3. It required exhibitors who issued tickets of admission to "any licensed exhibition or performance or to any

1948, p. 34. For legal history buffs, the case is of interest, not just because of the issue and the expedited proceeding but also because of the men involved. The judge was Joseph Sherbow, one of the luminaries of the then-Supreme Bench of Baltimore and one of this Court's initial appointees to its Standing Committee on Rules of Practice and Procedure. Representing the Naval Academy, as an *amicus*, was Simon Sobeloff, later to become Chief Judge of this Court, Solicitor General of the United States, and Chief Judge of the U.S. Court of Appeals for the Fourth Circuit. The lawyers for the parties were Bernard Melnicove and Reuben Shiling (for the plaintiff) and Thomas Biddison, Hamilton O'Dunne, and Leroy Preston (for the City), all of whom were then and remained until their deaths prominent members of the Baltimore City Bar.

**16.** *See* Baltimore *News Post,* October 29, 1948, p. 3.

game or sport" to print the established price or charge on the ticket and prohibited *the exhibitor* and *its* employees from charging or receiving any greater amount for the ticket, other than amounts for State or Federal taxes. For any violation, it provided for the revocation of the *exhibitor's* license, whatever it was, and a $500 fine.

Section 18A(b) dealt with ticket agents—persons engaged in the business of selling tickets to events conducted by licensed exhibitors. We may infer from its legislative history that, in its introductory form, in the same language now contained in §§ 21-1(a), 21-2, 21-4, and 21-5, it required, without exception, persons engaging in the business of selling tickets to such licensed events to have a ticket agency license issued by the City Treasurer, prohibited those licensees from charging more than 50¢ over the established price, and provided both criminal penalties and for the revocation of "any license under this section" for a violation. The exception now contained in § 21-1(b), which is at the heart of the issue before us, apparently was not in the introductory version of the ordinance but was added by an amendment proposed by the Committee on Legislation and Executive Nominations. *See Journal of Proceedings of the City Council of Baltimore* (Sessions 1948–49, Vol. 2, pp. 3292–93). There is no official record of the purpose and intent of the amendment, or whether it was derived from laws enacted in other cities.

As was discussed at oral argument before us, in today's world the 50¢ limit on surcharges by licensees may seem an anachronism. That was not the case when the ordinance was enacted, however. Tickets to performances at the Lyric sold for $1.21 to $3.62.[17] Tickets for matinee performances of *Carousel* at Ford's Theater in December 1947 and for *Oklahoma* during the week of October 4, 1948 also ranged from

---

**17.** *See* advertisements in the Baltimore *Sun* on September 26, 1948, p. A6, advertising tickets at those prices for performances of Gounod's *Romeo and Juliet*, the Paris Opera Ballet, and Gershwin's *Of Thee I Sing*. That seemed to be the standard range for Lyric performances. *See* Baltimore *Sun*, December 14, 1947, quoting those prices for tickets to a singing performance by Margaret Truman.

$1.21 to $3.62, although the better tickets for evening perform-
ances of *Oklahoma* cost $4.82.[18] Season tickets for 12 con-
certs by the Baltimore Symphony Orchestra sold at the box
office for $7.23 to $28.92.[19]

The box office prices for tickets to sports events were
comparable, although, depending on the teams, there contin-
ued to be significant scalping of those tickets. Tickets to
Baltimore Orioles games in 1948 ran from 60¢ for the bleach-
ers to $1.80 for box seats, although at the time the Orioles
were a minor league team in the International League.[20] A
ticket to the Baltimore Colts–Cleveland Browns game on
September 25, 1949 carried a box office price of $2.50. It was
reported here that ticket scalping was a problem in New York,
where tickets for the Broadway production of *South Pacific*,
with a box office price of $6.80, were being sold for $60 and
that New York had later adopted a law forbidding bonus fees
of more than 75¢ per ticket.[21]

The 1949 ordinance appeared in its original form in the 1950
City Code as Article 19, § 21, and in the 1966 City Code, the
1976 City Code, and the 1983 Replacement Volume of the 1976
City Code as Art. 15, § 24. The only change to the textual
language came in 1976, when the Director of Finance was
substituted for the City Treasurer as the licensor of ticket
agencies. In the 1966, 1976, and 1983 Codes, the caption
"Ticket Scalping" was added to the section. That was not in
the enacted version of the 1949 Ordinance or the 1950 Code.

Under the Ordinance, both as enacted in 1949 and as
included in the 1950, 1966, 1976, and 1983 Codes, it was
abundantly clear that what is now § 21–3 applied only to the

---

**18.** *See* Baltimore *Sun,* December 14, 1947, p. F6; Baltimore *Sun,*
September 26, 1948, page A6.

**19.** *See* Baltimore *Sun,* September 26, 1948, p. A6.

**20.** Information obtained from the Chief Curator of the Babe Ruth
Birthplace Museum.

**21.** *See* Baltimore *Sun,* May 19, 1949, p. 3, May 24, 1949, p. 3, March 2,
1950, p. 3.

exhibitor and not to ticket agencies, and that the rest of subtitle 21 (§§ 21-1, 21-2, 21-4, and 21-5) applied only to ticket agencies, and not to exhibitors. Unfortunately, the 2000 edition of the Code muddled somewhat that clear distinction through its structural reorganization of those provisions— placing § 21-3, which applied only to exhibitors, in the middle of provisions dealing with ticket agencies—although the legislative history source notes following the current provisions do make their origin clear.

The certified question seems to assume that, if § 21-1(a) were read by itself, ticket agencies operating as Ticketmaster does would be required to have a license, as it asks only whether such agencies are exempt from the licensing requirement under § 21-1(a) (and the 50¢ premium limit) by virtue of § 21-1(b). Ticketmaster does not agree with that assumption, however; as we shall observe, Ticketmaster believes that § 21-1(a) does not apply to it, or agencies like it. Although normally we do not stray beyond the question as submitted by the referring court, we do have the authority to "reformulate" a certified question (see CJP § 12-602), and, in order to provide a more complete and useful answer to the State-law issue certified, we shall address Ticketmaster's argument, which otherwise would likely be pressed when the battle returns to the District Court.

The plaintiff's position is (1) that § 21-1(a), read alone, is all-encompassing and requires *anyone* engaged in the business of selling tickets to events conducted by a licensed exhibitor to have a ticket agency license, and (2) that § 21-1(b), by its plain language, applies only to entities that are authorized by the exhibitor to sell tickets for the exhibitor "at the established price printed thereon." Although conceding that Ticketmaster has been authorized by Lyric to sell tickets to Lyric events, he argues that, because the Facility Agreement between Lyric and Ticketmaster, which is the source of that authority, permits Ticketmaster to add service charges and thus to sell tickets at more than the established price, Ticketmaster does not fall within the § 21-1(b) exception and therefore must have a ticket agency license under § 21-1(a).

Ticketmaster makes two arguments in response. It first contends that § 21–1(a) applies only to *resellers* of tickets, not to entities that make original sales. That argument is based on its belief that § 21–1, and indeed, all of subtitle 21 (and § 55–1) are concerned only with "scalping," which it insists involves only the *resale* of tickets at inflated prices. In making that argument, Ticketmaster relies on (1) what it refers to as the "history of Baltimore City's 'Ticket Agencies' and 'Ticket scalping' ordinances," its exposition of which, at best, is woefully incomplete, (2) the fact that the captions to §§ 21–3(a) and 55–1 contain the word "scalping," (3) some dictionary definitions of "scalping," (4) the notion that, because there are criminal penalties attached to violations, the ordinances must be given a strict and limited interpretation, and (5) several out-of-State cases. Effectively, it reads the phrase in § 21–1(a) "in the business of *selling* the tickets," as though it read "in the business of *reselling* the tickets." (Emphasis added). Under that construction, even § 21–1(a) alone, without regard to § 21–1(b), would not require that agencies such as Ticketmaster be licensed and would not limit the amount of surcharges they may exact. As we shall explain, that is not a proper construction.

The legislative history touted by Ticketmaster consists of comments made by supposedly "key participants" in unsuccessful efforts in 2008 and 2009 to enact an ordinance that would have exempted the resale of tickets over the Internet from Art. 15, Subtitle 21 and Art. 19, § 55–1. Ticketmaster infers from those comments a belief on the part of those participants that the current ordinances applied only to the resale of tickets. The comments quoted are both ambiguous and wholly irrelevant. We have recounted the relevant legislative history. The failure of the 2008 and 2009 attempts to permit Internet scalping simply indicates that the City Council did not wish to allow that practice.

With respect to the "caption" argument, as noted, there was no caption in the original ordinance that enacted what is now subtitle 21, and, indeed, the word "scalping" did not appear anywhere in that ordinance. Nor were there any captions to

the subtitle in its first codification in 1950. Although there is no general statute applicable to Baltimore City Codes as there is in Maryland Code, Art. 1, § 18, making captions in State statutes "mere catchwords" and not part of the statutes themselves, the same principle applies. In the ordinance "legalizing" the 2000 City Code (Ordinance 99–524), the Mayor and City Council specifically authorized the Director of Legislative Reference to "recaption" sections, thus indicating that captions are not intended to be part of the law enacted by the City Council. Even if that were not the case, a caption added decades after the enactment of the ordinance cannot serve to change the meaning of the ordinance or to indicate the intent of the City Council that enacted it.

We also reject Ticketmaster's other arguments in support of limiting § 21–1(a) to resellers. The requirement that "[n]o person shall engage in the business of selling the tickets . . . evidencing the right of admission to [performances] conducted by [licensed exhibitors]" without a license issued by the Director of Finance means precisely what it says. There is nothing ambiguous about it and no basis for us to read the word "selling" as limited to "reselling." Whether or not § 21–1(a) could be read as *including* reselling, it cannot properly be read as *limited* to reselling. Laws applicable only to the resale of tickets expressly so provide,[22] and those, like the ordinances before us, that make it unlawful "to sell or offer for sale" have been construed as not limited to resales. *See McMillan v. Live Nation Entertainment, Inc.,* —— S.W.3d ——, 2012 Ark. 166 (2012).

The cases relied upon by Ticketmaster are not at all on point. They all involve situations in which a defendant, who was criminally charged with violating a scalping law by *reselling* a ticket for more than the price on the ticket, argued that the scalping law was unconstitutional. In three of the cases, the court agreed with the defendant, holding that it was

---

**22.** *See* La. R.S. 4:1 ("no person shall resell or offer to resell such admission ticket"); 4 P.S. § 211; ALM GL ch. 140, § 185D (no licensee shall "resell any ticket . . .").

Constitutionally impermissible for a legislature to preclude an individual from selling his property at whatever price he could obtain for it; in two, the court found the law constitutional.[23] None of those cases are relevant to the construction of § 21–1.

We have recounted, from the best evidence available, the history of Ordinance 49–735. It does not, as Ticketmaster urges, indicate an intent to reach only resellers of tickets. Although there certainly was concern over the scalping of tickets, principally football tickets and most particularly tickets to Naval Academy football games, a lesson was learned from the nullification of the earlier ordinance, which was directed *only* at that. The ordinance now at issue was and is broader in scope. It applies not just to ticket agencies but also to exhibitors and their agents and prohibits *both* from selling tickets to licensed events in the City at more than the established price. There is nothing in the legislative history that would warrant a construction of § 21–1(a) inconsistent with its plain language.

 Because we find no ambiguity in the plain language of the ordinances, there is no basis for creating one by applying a rule of lenity, as requested by Ticketmaster. As this Court recently confirmed, the rule of lenity "serves only as an aid for resolving an ambiguity and it may not be used to create an ambiguity where none exists." *Tribbitt v. State,* 403 Md. 638, 646, 943 A.2d 1260, 1265 (2008).

Ticketmaster's second argument, which we shall deal with also in responding to the second and third certified questions, is that the addition of an "authorized" service charge for the convenience of allowing customers to purchase tickets by telephone or other electronic means does not constitute selling the ticket for more than the established price printed on it.

**23.** *See Kirtley v. State,* 227 Ind. 175, 84 N.E.2d 712 (1949); *Ex Parte Quarg,* 149 Cal. 79, 84 P. 766 (1906); and *Estell v. Birmingham,* 291 Ala. 680, 286 So.2d 872 (1973) (holding the statute unconstitutional); and *compare State v. Spann,* 623 S.W.2d 272 (Tenn.1981); and *State v. Youker,* 36 Or.App. 609, 585 P.2d 43 (1978) (holding the statute Constitutional).

The ticket, it posits, is sold for the established price. The extra exaction—the service charge—is not for the ticket but for the convenience of being able to purchase the ticket by electronic means, of being able to pay for it by use of a credit card, of having it mailed or otherwise remotely delivered to the purchaser. Under this theory, Lyric's authorization for Ticketmaster to collect a service charge in whatever amount it chooses would not constitute an authorization to sell the tickets for more than the established price.

We find that theory untenable. It essentially eviscerates the ordinance. Ticketmaster's ultimate conclusion—that it falls within the exception in § 21-1(b)—is correct, however, for another reason, one that is consistent with the ordinance and its purpose: under the ordinance, read as a whole, Lyric may not *validly, lawfully* authorize Ticketmaster, or anyone else, to sell tickets for more than the established price, and any purported authorization to do so is simply nugatory.

Harking back to 1949, when what is now subtitle 21 was enacted, there was, of course, no Internet, no online sales of tickets. There were charge cards at the time, but they were issued mostly by oil companies and department stores and were limited to purchases of their products.[24] Customers purchased tickets to entertainment or sports events, other than through scalpers, by appearing at the box office or other outlet[25] and paying the established price for them or, when

---

**24.** In 1949–50, Diner's Club issued the first general purpose charge card, meant for high-end customers who used them for travel and entertainment purposes and paid the full amount of such charges each month. The American Express card and a Bank of America credit card, later to become Visa, were first issued in 1958. Other general purpose credit cards appeared in 1966. *See* Akers, Golter, Lamm, and Solt, *Overview of Recent Developments in the Credit Card Industry,* FDIC Banking Review, Vol. 17, No. 3 (2005); also *Cards, Cards, and More Cards: The Evolution of Prepaid Cards,* Federal Reserve Bank of St. Louis, www.stlouisfed.org/publications/itv/articles/?id=2168.

**25.** According to the newspaper ads, tickets to some theater events and musical performances in Baltimore could be purchased from Bonney Concert Bureau, an entity operated by Lillian P. Bonney. Bonney was not a scalper but a promoter who brought musical artists and perform-

permitted by the seller, by sending a check and a stamped return envelope to the office. The conveniences, for which Lyric has purported to authorize Ticketmaster to exact an additional charge, did not exist and likely could not have been within the contemplation of the City Council. The City Council obviously recognized, however, that there was some public benefit to be had—some convenience—from allowing tickets to be purchased from outlets other than the exhibitor's box office, because it allowed licensed ticket agencies, *though no one else,* to charge an additional 50¢, which, given the established price of tickets at the time, it regarded as a reasonable markup—the kind of markup which the court, in reviewing the 1948 ordinance, had indicated could pass Constitutional muster.

All that has happened since 1949 is that, along with prices and costs generally, the price of tickets to sports and entertainment events has risen significantly—from between one and four dollars to, in this case, $52—but the 50¢ markup limit for licensed agents has remained the same. The ordinance may be functionally obsolete in that regard, but it is not legally so. The City Council has had the ordinance before it several times since 1949—when it enacted the 1950, 1966, 1976, 1983, and 2000 Codes and when it actually amended the ordinance in 1976—but has seemed content to leave its fundamental provisions intact.

Section 21-1(b) has to be read in harmony with § 21-3, which was part of the same ordinance. As noted, § 21-3 prohibits the exhibitor and any of its officers or employees from selling tickets to licensed events at a price greater than the established price printed on the ticket. They cannot charge even the additional 50¢ allowed to licensed ticket

---

ances to Baltimore and sold tickets at box office prices to those performances. Baltimore *Sun,* August 4, 1960, p. 10. The City Solicitor, in an official opinion dated August 3, 1949 to the City Treasurer, opining that the Baltimore Symphony Orchestra Association was not required to be licensed under the ordinance, took notice that Bonney sold tickets to musical performances "without any additional handling or brokerage charges."

agencies. If Ticketmaster is correct that the term "established price," as used in § 21–1(b), does not include convenience fees denoted as service charges, then, as both sides have agreed, the same construction would have to be given to the term as used in § 21–3, and the exhibitor also could conjure up all sorts of additional charges, declare them to be convenience fees, not include them in the established price of the ticket, but charge them anyway, which would make § 21–3 utterly meaningless and the established price printed on the ticket completely misleading. That is not an appropriate reading of § 21–3 and therefore cannot be an appropriate reading of § 21–1(b), by reference either to its plain language or to its legislative history. Unlike laws in other States, there is no indication of any intent on the part of the City Council to permit an exhibitor to authorize a ticket agency, as its agent, to do what the exhibitor cannot do directly.[26]

A more limited construction, however, does not resolve the licensing issue presented in the first certified question. The clear import of § 21–1(b), when read in conjunction with § 21–3, is that an exhibitor is not lawfully permitted to authorize *anyone* to charge more than the established price. A licensed ticket agency may charge an additional 50¢, not because the exhibitor authorizes it but because § 21–2 allows it by law. If the exhibitor purports to authorize charges over and above the established price, the authorization is invalid and therefore cannot be regarded as relevant to whether the agent must be licensed.

---

**26.** *See* La. R.S. 4:1 (Louisiana) and MCLS § 750.465 (Michigan) expressly permitting the exhibitor to authorize tickets to be *resold* for more than the price printed on the ticket. *See* also ALM GL ch. 140, § 185D (Massachusetts) expressly providing that the sale of tickets for more than the price printed on them is not unlawful if the excess is due to "service charges." We have not been asked in any of the certified questions whether fees or rebates received by Lyric from Ticketmaster or that are charged directly by Lyric in excess of the established price are permitted by § 21–3, and we expressly decline to make any holding on those matters. Our reference to § 21–3 is solely as a guide to interpreting § 21–1(b).

The true crux of § 21–1(b) is that a ticket agency license is not required for an entity that is authorized in writing by a licensed exhibitor, as an agent for the exhibitor, to make original sales for the exhibitor. Although § 21–1*(a)* may extend to those who resell tickets, the authorization under § 21–1*(b)* necessarily can relate only to original sales. Absent allegations or evidence, of which there are none in the record before us, that tickets to an event are in the nature of special invitations restricted to the initial recipient and are non-transferable, original sales are all that the exhibitor can control. No authority from the exhibitor is necessary to allow people who have already purchased tickets to resell them.

The Facility Agreement clearly provides a written authorization for Ticketmaster to make original sales of tickets to Lyric events as an agent for Lyric, and, for *that* reason, Ticketmaster (as the only agency so authorized) is not required to be licensed by reason of exercising that authority. Because the certified question is couched in general terms and is not limited to Ticketmaster's arrangement with Lyric, we do note this caveat: Because, under § 21–1(a), a license is required in order to "engage in the business" of selling tickets, the exception in § 21–1(b) applies only if *all* of the tickets sold or offered for sale by the agency to covered events in Baltimore City are pursuant to written authorization by licensed exhibitors.

With that caveat, we therefore answer the first certified question as follows:

**If a ticket agency is authorized in writing by a licensed exhibitor to sell tickets as an agent of the exhibitor, the ticket agency is not required to be licensed by reason of exercising that authority. A purported authorization by the exhibitor to charge more than the established price is invalid and does not limit or expand the exception in § 21–1(b).**[27]

---

27. Courts must apply the law as they find it and, to be true to the established rules of statutory construction, may not unduly stretch it to reach what they may perceive to be a more convenient result. We do

Question No. 2

### Does Article 19, § 55–1 Apply to Original Sales or Only Resales?

 What is now Art. 19, § 55–1 was first enacted in 1958 as Ordinance No. 1574. The only amendments that have been made since were an increase in the fine for violations in 1994 (Ordinance 94–385) and permitting violations to be charged by citation in 2003 (Ordinance 03–595). Like the 1949 ordinance, its provisions were originally all in one undivided section of the Code. In later codifications, the section was split into subsections, there now being four of them.

Unlike the 1949 ordinance, this one was aimed exclusively at scalping. It repealed the 1948 ordinance directed only at tickets to football games, which had remained in the Code despite the injunction against its enforcement, and replaced it with a broader prohibition against any person, firm, association, or corporation selling or exchanging or offering to sell or exchange tickets to any public amusement, athletic, educational, or other event in Baltimore "for more than the price stated thereon or for remuneration in any form greater than such price." In an effort to create harmony with the 1949 licensing law, however, the ordinance provided that it was not to be construed as making illegal or invalidating "the excess sum which is permitted to be charged for certain tickets by a person engaged in the business of selling tickets under the provisions of Section 21 of Article 19 of the Code."

Like its invalid predecessor, Ordinance No. 1574 also was on a fast track. No amendments were offered to the introductory version. The Rules were suspended several times, and the ordinance was passed a week after it was introduced. *See Journal of Proceedings of the City Council of Baltimore,* Sessions 1955–1959, pp. 359–61 and 424–26. Although a Balti-

---

note, however, that, if Lyric or any other exhibitor wishes to allow a ticket agency authorized to make original sales as its agent to add convenience surcharges for remote or credit card sales, it can easily provide for that in the established price printed on the ticket.

more *Sun* article stated that the bill was introduced to make the scalping of *baseball* tickets illegal, noting that four-to-six dollar tickets to an upcoming Orioles game were being sold for $15 to $25,[28] the ordinance clearly extended well beyond baseball tickets.

Both parties view § 55–1 in the same way they view Article 15, subtitle 21. Ticketmaster's position is (1) that because § 55–1 is an anti-scalping ordinance, it applies only to resales, and (2) that even if it applies to original sales, service charges are not precluded if the ticket agency sells the tickets as an agent for the exhibitor.

The plaintiff insists that the plain wording of the statute controls: it is unlawful for "any" person or entity to sell or offer tickets for more than the established price printed thereon. That includes original sales, and it means what it says. There is nothing ambiguous about the language, and the Court should not be adding or changing words to express some other meaning.

In support of his position, the plaintiff cites a recent decision of the Arkansas Supreme Court, *McMillan v. Live Nation Ent., Inc., supra*, —— S.W.3d —— (2012). That case also arose from a question certified by a U.S. District Court, one seeking clarification of an Arkansas law that made it unlawful for "any person, corporation, firm, or partnership to sell or offer for sale any ticket" to certain events "at a price greater than that printed on the ticket or the box office sale price plus any reasonable charge for handling or credit card use, whichever is greater." Coincidentally, the Federal case was a class action against Ticketmaster for adding fees of $12.40 to the printed ticket price of $42.75. The question was whether the statute was applicable to "an exclusive agent of a public facility who sells music entertainment tickets that include in the price of the ticket additional fees, resulting in the price of the ticket being more than the face value and advertised price

---

28. *See* Baltimore *Sun*, June 22, 1958, p. F18. In 1954, the Orioles became a major league team.

44

of the ticket." As here, Ticketmaster argued that the law applied only to resales, which the Arkansas Court flatly rejected as being inconsistent with the plain wording of the statute.

We reach the same conclusion with respect to § 55–1 as we did with respect to Art. 15, subtitle 21—that the language used by the City Council is unambiguous and cannot properly be read as limited to the resale of tickets. If the City Council meant to limit the ordinance in that manner, it could easily have said so, as other legislatures have done. We therefore answer the second certified question as follows:

**Article 19, § 55–1(a) is not limited to ticket resales. Except as permitted in § 55–1(b), it prohibits the collection of a service charge, in addition to the established price printed on a ticket, in connection with the original sale of the ticket by the exhibitor or the exhibitor's authorized agent.**

Question No. 3

*Does § 55–1(b) Allow A Ticket Agent Not Licensed And Not Required To Be Licensed Under Art. 15, § 21–1 To Add A Service Charge To The Established Price Printed On The Ticket?*

The answer to this question follows from what we have already said. Art. 15, § 21–3 prohibits a licensed exhibitor and its officers and employees from charging anything more for tickets to its events in Baltimore City than the established price printed on the ticket, and from collecting anything more than that, plus any taxes imposed by the State or Federal government. Because it may not charge or collect any additional amounts itself, it may not authorize agents to do so on its behalf. Section 21–2 permits a ticket agency licensed under § 21–1, and only such a licensee, to collect an additional 50¢ per ticket. That is the only service charge permitted under subtitle 21. Section 55–1(a), read alone, would prohibit even the 50¢ service charge. Section 55–1(b), however, exempts from that prohibition "the excess sum which is permitted to be charged for certain tickets by a person

engaged in the business of selling tickets under the provisions of Article 15, Subtitle 21 ...” That, necessarily, relates to the 50¢ service charge permitted to licensed ticket agencies. Accordingly, we answer the third certified question as follows:

**Article 19, § 55–1(b) does not permit anyone other than a ticket agency licensed under Art. 15, § 21–1 to collect anything more for a ticket than the established price printed on the ticket plus applicable State or Federal taxes. Included in that prohibition is a ticket agency exempt from licensure under Art. 15, § 21–1(b). Section 55–1(b) does permit a ticket agency licensed under Art. 15, § 21–1 to collect an additional 50¢ per ticket.**

Question No. 4

*Does Maryland Continue To Recognize the Common Law Action Of Money Had And Received; If So, May Such An Action Be Maintained To Recover Money Collected In Violation Of The Baltimore City Ordinances?*

An action for money had and received is one of what have been referred to as the “common counts” or “common money counts” that developed under English common law as a branch of the common law writ of assumpsit—*indebitatus assumpsit.* Judge Charles Moylan, writing for the Court of Special Appeals in *Alternatives Unlimited v. School Commissioners*, 155 Md.App. 415, 843 A.2d 252 (2004), set forth the general history of assumpsit and reviewed briefly the development of the common counts. The history of the common counts under Maryland and English law is found in greater detail in *Poe’s Pleading and Practice*, 6th (Sachs) ed. §§ 71–136 (1970).

We need not repeat all that is said in those treatises. It is clear, really beyond cavil, that at least 25 of the common counts were long recognized as permissible actions in Maryland and that, as late as 1970, at least seven of them remained popular and, when appropriate, were often pled. *See Poe’s*

*Pleading and Practice, supra,* § 90.[29] The District Court asks only whether the action for money had and received remains a viable one and, if so, whether it may be used to recover money collected in violation of the Baltimore City Ordinances.

Although with the more modern pleading Rules adopted by this Court in 1984—*see,* in particular, Rules 2–303 and 3–303— the common counts are rarely pled any more, this Court has never repealed or repudiated them. Indeed, only seven years ago, the Court expressly recognized the viability of an action for money had and received. In *Benson v. State,* 389 Md. 615, 652–53, 887 A.2d 525, 547 (2005), we observed:

> "The action for money had and received is a common count used to bring a restitution claim under the common law writ of assumpsit. *Ver Brycke v. Ver Brycke,* 379 Md. 669, 698 n. 13, 843 A.2d 758, 775 n. 13 (2004). We have stated that this count 'lies whenever the defendant has obtained posses- sion of money which, in equity and good conscience, he ought not to be allowed to retain.' *State, Use of Employ- ment Sec. Bd. v. Rucker,* 211 Md. 153, 126 A.2d 846 (1956)."

*See also Hill v. Cross Country Settlements,* 402 Md. 281, 314, n. 21, 936 A.2d 343, 357, n. 21 (2007); J. Lynch and R. Bourne, *Modern Maryland Civil Procedure,* 2nd, ed., § 6.4(b).

Ticketmaster has not persuaded us that we should change that view, and we decline to do so. An action for money had and received is a well-established remedy with a long history in this State, and, so long as it continues to have any useful- ness, we see no reason to abrogate it.

---

**29.** As late as 1973, forms for pleading 25 of the common counts were included in the Maryland Code. *See* Md.Code, Art. 75, § 14 (1969 Repl.Vol.). That section was repealed as part of the Code Revision process that produced the Cts. & Jud. Proc. Art. in 1973. The explana- tion for the repeal was that the subject was then covered by Md. Rule 301(1). *See* 1973 Md. Laws (Special Session), ch. 2, p. 237. In 1920, this Court observed that "[t]here are so many cases in this State showing the practice and use of joining common counts with special ones, that it is unnecessary to refer to many of them." *Conservation Co. v. Stimpson,* 136 Md. 314, 318, 110 A. 495, 496 (1920).

With respect to the second prong of the question, the plaintiff, citing a number of this Court's decisions, argues that a claim for money had and received is available to recover money paid in violation of a statute, including when extracted unlawfully pursuant to a contract. His view is that, unless the statute in question provides otherwise, contracts that violate the statute are void and that there is a natural or equitable obligation on the part of the recipient of money unlawfully collected pursuant to the void contract to return it. Ticketmaster regards the cases cited by the plaintiff, apparently including *Benson*, decided in 2005, as "archaic."

Wandering well beyond the scope of the certified question, the major thrust of Ticketmaster's argument is that Article 19, § 55-1 does not itself create a private remedy for a violation of its prohibition and that, even if it did, the City is without any authority to create such a private remedy. The question certified, however, is not whether the ordinance itself creates a private right of action but whether the common law action for money had and received provides a private remedy for a violation of the ordinance. That is the question we shall address.

In *State, Use of Emp. Sec. Bd. v. Rucker*, 211 Md. 153, 157–58, 126 A.2d 846, 849 (1956), this Court agreed with Poe's conception of the action as lying "whenever the defendant has obtained possession of money which, in equity and good conscience, he ought not to be allowed to retain" and with the view of Lord Mansfield in *Moses v. Macferlan*, 2 Burroughs 1005 that "[i]f the defendant be under an obligation, from the ties of natural justice, to refund; the law implies a debt, and gives this action, founded in the equity of the plaintiff's case, as it were upon a contract ... and the gist of this kind of action is, that the defendant, upon the circumstances of the case, is obliged by the ties of natural justice and equity to refund the money."

Notwithstanding that broad language, there developed caveats and nuances which serve to limit the circumstances in which the action would lie, including, as we shall see, one

blessed by Lord Mansfield himself. Early cases in Maryland permitted the action to recover money received by the defendant upon a mistake of *fact*, but not upon a mistake of *law*. As Poe notes, however, "the rule against the relief from consequences of a mistake of law has been considerably limited to avoid the injustice which would result from the universal application of so broad a rule," *Poe, supra*, § 119, and, as noted, in *Benson*, we stated that the action could be based on mistake of fact or law. The softening of the bar has often been achieved by regarding the mistake in question as a mixed one of law and fact, or as predominantly one of fact. *See Oxenham v. Mitchell*, 160 Md. 269, 278–79, 153 A. 71, 75 (1931).

It is not entirely clear from the plaintiff's complaint whether he is proceeding under a mistake of either fact or law. He apparently was aware that service fees in excess of the price on the ticket were being charged by Ticketmaster, and he knew what they were. The only lack of knowledge of fact actually alleged was that part of the service charge would be rebated to Lyric. There is no allegation regarding his awareness of the City ordinances, or lack thereof, when he purchased his ticket.

Although an action for money had and received may be based on money paid under mistake of fact or law, that is not the only basis for the action. Maryland cases have found it available to recover money obtained by fraud or false pretenses, paid upon an unexecuted illegal contract, or, in certain circumstances, paid under an executed illegal contract. *See* Poe, *supra*, §§ 120–126 and cases cited there.

The branch of the action that appears to be the one most on point, based on the complaint and the plaintiff's brief, is that the service charges were paid pursuant to an illegal, and thus allegedly void, agreement. The illegal transaction, according to the complaint, involved both the agreement the plaintiff made with Ticketmaster to purchase the ticket, pursuant to which Ticketmaster exacted the illegal surcharge, and the Facility Agreement between Ticketmaster and Lyric that pur-

ported to authorize Ticketmaster to exact the service charge and to require the rebate of part of it to Lyric. Although the plaintiff was a party only to his agreement with Ticketmaster, part of the excess sum collected pursuant to that agreement was allegedly paid to Lyric.

Poe correctly cites Maryland case law for the proposition that an action for money had and received does lie to recover money paid under an *executory* illegal contract—one not yet fully consummated—but generally not to recover money paid under a fully executed contract. *See* Poe, *supra*, §§ 122 and 123. The basis for this distinction is set forth in a number of cases, most notably *Harrington v. Bochenski*, 140 Md. 24, 30–31, 116 A. 836, 839 (1922), *Van Meter v. Wilkinson*, 187 Md. 492, 498, 50 A.2d 557, 560 (1947), and *Shirks Corp. v. Forster Co.*, 214 Md. 18, 30, 133 A.2d 59, 65 (1957).

The *Harrington* Court noted that the reason for allowing the recovery of money paid under a contract still executory in nature is "the encouragement of the abandonment of illegal contracts and to prevent a violation of the law." *Harrington*, 140 Md. at 31, 116 A. at 839. Recovery in that setting "is not under, but independently of the contract; the contract to be treated as a nullity." *Id.* When the contract is fully executed, however, the situation is different, for in that setting, the parties *ordinarily* are *in pari delicto* and neither should be able to take advantage of the illegality. In *Van Meter*, 187 Md. at 498, 50 A.2d at 560, the Court, quoting from *Bayne v. Suit*, 1 Md. 80 (1851), confirmed that "[t]he test in such cases, whether a demand, connected with an illegal transaction, is capable of being enforced at law, is whether the plaintiff must resort to the illegal transaction to aid in establishing his case."

One exception to the disallowance of the action where the agreement has been fully executed that has long been recognized, at least as a matter of common law, is where the illegality arises from the exaction of usurious interest. In that situation, the borrower has not been regarded as being *in pari delicto* with the lender. As far back as *Baugher v. Nelson*, 9 Gill 299, 308 (1850) and *Scott v. Leary*, 34 Md. 389 (1871), it

was held that "at common law a party who has paid excessive interest may recover it back in an action for money had and received" because "[t]o such cases the maxims *'in pari delicto potior est conditio defendentis'* and *'volenti non fit injuria'* have no application." *Scott*, 34 Md. at 394. The *Scott* Court adopted the reasoning of Lord Mansfield in *Browning v. Morris*, Cowp. 792 and 3 *Parsons on Cont.* 128, noting that:

> "[T]he distinction has been taken between statutes enacted on general grounds of policy and public expediency in which each party violating the law is *in pari delicto* and entitled to no assistance from a court of justice, and those laws enacted to protect weak or necessitious men from being over-reached, defrauded or oppressed, in which event the injured party may have relief extended to him, and the whole purport and reason, both of the law of usury and of the great mass of decisions under it, indicate that the lender on usury is regarded as the oppressor and the criminal, and the borrower as the oppressed and injured."

That exception remains a part of Maryland law. *See Plitt v. Kaufman*, 188 Md. 606, 612, 53 A.2d 673, 676 (1947) and *Dua v. Comcast Cable*, 370 Md. 604, 632, n. 11 and 646–47, 805 A.2d 1061, 1077, n. 11 and 1086 (2002), *but see also Carter v. Huntington*, 420 Md. 605, 631, 24 A.3d 722, 737 (2011), indicating that the expression of that principle in the footnote in *Dua* was *dicta*.

This Court has not repudiated the general principle that parties to a fully executed illegal contract, except one exacting usurious interest, ordinarily are regarded as being *in pari delicto* and that, as a result, the common law action for money had and received does not lie to recover money paid under such a contract. Nor has it disavowed the reasoning long ago accepted for that principle.[30]

---

**30.** We do take note of *Riemer v. Columbia Medical*, 358 Md. 222, 747 A.2d 677 (2000), where members of an HMO who (1) had been injured in automobile accidents, (2) received medical or hospital care through the HMO, and (3) subsequently settled with or recovered a judgment for damages from the tortfeasor, sued the HMO to recover funds paid to

Based on these long-established common law distinctions and limitations, we conclude that an action for money had and received will lie to recover money paid in excess of that allowed under the Baltimore City ordinances if the agreement exacting that excess remains executory—not fully consummated and thus subject to disaffirmance. If the agreement is fully executed, however, and there are no special circumstances that would preclude a finding that the parties were *in pari delicto*, the action will not lie. The resolution of that issue, at least in part, is a factual matter for the District Court to determine. We therefore answer the fourth certified question as follows:

> **Maryland continues to recognize a common law action for money had and received. Unless otherwise precluded by statute, such an action will lie to recover money paid in excess of that allowed by statute, including the Baltimore City ordinances, if the agreement pursuant to which it was paid has not been fully consummated, *i.e.*, remains executory. Except with respect to a usurious contract, however, the action does not lie to recover money paid under a fully consummated contract as to which the parties may be regarded as being *in pari delicto*.**

**QUESTIONS ANSWERED AS HEREIN SET FORTH; COSTS TO BE PAID ONE–HALF BY APPELLANTS AND ONE–HALF BY APPELLEES.**

the HMO from the third-party recovery pursuant to a subrogation lien asserted by the HMO, claiming that the subrogation lien was not allowed by a Maryland statute. It is not clear whether the case involved an action for money had and received, but even if it did, the money was not paid voluntarily, and, because the contract was a continuing one for medical care, it does not appear that it was fully executed when the action was filed.