# MORTICIANS

**HEALTH OCCUPATIONS – MORTICIANS – PRICE PROVISIONS OF MONEY-TRUSTED PRE-NEED FUNERAL CONTRACTS MUST BE GUARANTEED**

March 1, 2013

*The Honorable Wade Kach*
*Maryland House of Delegates*

On behalf of the State Board of Morticians and Funeral Directors ("the Board"), you have asked for our opinion as to whether Maryland law permits a licensed mortician or funeral director to enter into money-trusted pre-need funeral contracts in which the price of some of the goods or services agreed upon is not guaranteed. In a money-trusted pre-need funeral contract, the consumer purchases funeral goods (*e.g.*, a casket) and services (*e.g.*, embalming) for herself or another beneficiary ahead of time and at then-prevailing market prices. You have explained that such contracts often contain non-guaranteed price terms and that funeral homes often ask the surviving relatives of the deceased to "make up the difference" between the contract price and the market price at the time the contracted-for goods and services are actually provided. You have also explained that some uncertainty exists among members of the funeral industry as to whether such contracts are permissible under Maryland law.

In our opinion, the plain language of the statute—§ 7-405 of the Health Occupations Article—requires that money-trusted pre-need contracts include the "total price" of the services and merchandise agreed upon, which we interpret to mean that the price terms of the contract must be guaranteed. A pre-need contract may include estimated prices for those goods and services reasonably expected to be required at the time of need but not included under the contract, but the licensed mortician or funeral director may not accept pre-payment for such non-included goods and services. This interpretation finds support in the statutory scheme and legislative history, as well as in principles of statutory construction that direct us to read the statute in a way that furthers its consumer protection purpose.

3

# I

## Background

*Pre-Need Funeral Contracts*

A pre-need funeral contract involves the purchase of funeral-related goods and services prior to the death of the beneficiary, who typically is the buyer or a family member or loved one of the buyer.[1]  The buyer pays for the goods and services based on the prices in effect at the time the contract is entered into, and the seller agrees to provide the agreed-upon goods and services when the beneficiary dies.  The buyer may fund the contract with cash, in which case the purchase money is placed in a trust to be paid to the seller at the beneficiary's death, or with a life insurance policy, in which case the benefits of the policy are assigned to the seller.

A pre-need contract provides several potential benefits to the buyer.  It gives the buyer a greater advance role in determining the types of funeral services that will ultimately be provided to memorialize the beneficiary.  It also gives the buyer the opportunity to purchase those services at his or her leisure, with time to compare prices at different funeral homes.  Further, pre-purchasing funeral arrangements can save the beneficiary's survivors the expense and inconvenience of making funeral arrangements at a difficult time.  Finally, in certain jurisdictions—and whether Maryland is one of them is central to this opinion—the pre-need contract allows the buyer to lock in current market prices as a way to protect against inflation, much as college pre-paid tuition plans allow parents to lock in today's tuition rates.

---

[1]  Three housekeeping items:  First, we will use the term "buyer" to refer to the consumer who enters into a pre-need contract, "seller" to refer to the licensed funeral director or mortician who agrees to provide funeral goods and services, and "beneficiary" to refer to the person whose funeral is arranged pursuant to the contract.  Second, although the General Assembly uses the spelling "preneed" in enactments addressing subjects other than mortuary practices, it uses the term "pre-need" in the Maryland Morticians and Funeral Directors Act.  As we have previously, *see* 80 *Opinions of the Attorney General* 188, 193 n.3 (1995), we will use the spelling "pre-need" here.  Third, except as otherwise noted, all statutory citations in this opinion refer to Title 7 of the Health Occupations Article of the Annotated Code of Maryland (2009 Repl. Vol., 2012 Supp.).

For the seller, the pre-need contract allows the funeral home to secure a more stable expectation of future business, which can aid long-term business planning. The pre-need contract also guarantees the funeral home full payment for services to be rendered at the time services are rendered, which also provides greater stability and financial predictability. Finally, depending on state law, the pre-need contract can offer the seller operating capital, if the funeral director is allowed to hold and use a certain percentage of the purchase price, and the prospect of greater profits, if the interest earned on the purchase price increases at a rate greater than the cost of funeral expenses.

The practice of pre-need funeral planning dates back to at least the 1930s, when burial associations began selling "burial certificate plans." The idea spread to the funeral industry in the 1950s, when funeral directors began selling pre-need funeral arrangements in the United States. S*ee* Sandra B. Eskin, AARP Pub. Policy Inst., *Preneed Funeral and Burial Agreements*: *A Summary of State Statutes* 3 (1999), http://assets.aarp.org/rgcenter/consume/d17093_preneed.pdf (last visited Feb. 23, 2013). Licensed funeral directors and morticians in Maryland have been offering pre-need funeral contracts for decades. *See Undertakers Fight Cemeterians: Each Group Is Backing A Different Funeral Fraud Bill*, Baltimore Sun, March 10, 1967, at C12 (describing testimony of industry representatives before Senate Economic Affairs Committee). The prevalence of pre-need contracts has increased over the past fifty years as the population has aged, with recent industry estimates putting the total amount invested in pre-need contracts at $35 billion nationwide. U.S. Gov't Accountability Office, GAO-12-65, *Death Services: State Regulation of the Death Care Industry Varies and Officials Have Mixed Views on Need for Further Federal Involvement* 52 (2011) ("GAO Report") (*available at* http://www.gao.gov/assets/590/586972.pdf (last visited Feb. 27, 2013)).

*The Regulation of Pre-Need Funeral Contracts*

With the growth of pre-need funeral planning have come fraud warnings and consumer advisories about the risks of pre-need contracts. *See*, *e.g.*, GAO Report at 52-55. Due to the nature of pre-need contracts, there often is a long period of time between bargaining and performance, which provides a "fertile field for fraud." *State of Kansas*, *ex rel. Londerholm v. Anderson*, 408 P.2d 864, 870 (Kan. 1965). Misappropriation of contract funds may not become apparent until years later, when the goods

and services are required. *See* Eskin at 3. It is also often difficult to determine whether the contract is performed in a manner that fulfills the parties' expectations in those instances where the buyer is also the beneficiary and, thus, is deceased at the time of performance. *Id.* And "pre[-]need agreements are becoming increasingly complex, involving more decisions and more potential for fraudulent activity." *Id*. at 4. Journalists, consumer advocates, and government agencies all advise potential buyers to consider carefully before making pre-need arrangements. *See, e.g.*, Anne Tergesen, *When Prepaid Funeral Plans Are Wealth Killers*, Wall St. Journal, May 22, 2010 (available from http://online.wsj.com (search "prepaid funeral plans"); Funeral Consumers Alliance, *The Pitfalls of Preneed*, http://www.funerals.org/faq/198-preneedpitfalls (last visited Feb. 27, 2013); Fed. Trade Comm'n, *Funerals: A Consumer Guide* (*available at* http://www.consumer.ftc.gov/articles/pdf-0056-funerals.pdf (last visited Feb. 28, 2013)).

Because of the risk of fraud, it appears that all fifty states regulate pre-need funeral contracts in some manner. Eskin at 3.[2] Although state regulation of pre-need contracts varies in many significant respects, most regulatory regimes include provisions governing the disclosure of certain contract terms and the management of contract funds held in trust prior to performance. Many states also afford consumers the right to terminate the contract and re-direct the contract funds to another funeral home—referred to as "portability." GAO Report at 48-50.

At the federal level, the Federal Trade Commission ("FTC") has enacted regulations that require various disclosures to the buyer. The funeral home must provide a "general price list" of the goods and services that it offers, must make specific written disclosures about the funeral process, and is specifically prohibited from making certain misrepresentations. *See generally* 16 C.F.R. Part 453. For example, FTC rules make it a deceptive trade practice to "[r]epresent that state or local law requires that a deceased person be embalmed when such is not the case," 16 C.F.R. § 453.3(a)(1)(i), or to "[c]ondition the furnishing of any funeral good or funeral service . . . upon the purchase of any other funeral good or funeral service." 16 C.F.R. § 453.4(b)(1)(i).

---

[2] Eskin, writing in 1999, identified Alabama as the only state that did not regulate pre-need funeral contracts, but it has since enacted legislation that does so. *See* 2002 Ala. Acts 74 (codified at Ala. Code § 27-17A-33 (2012)).

Despite these state and federal regulatory efforts, the GAO reports that the pre-need segment of the industry has "come under increasing scrutiny in recent years because of various allegations of fraud and mismanagement of pre-need funds." GAO Report at 55. In one instance, the new owners of a Tennessee funeral home refused to honor existing pre-need contracts and required the survivors to pay an additional $4,000 for the agreed-upon goods and services. *See In re Forest Hill Funeral Home & Mem. Park - East*, 364 B.R. 808, 815 (Bankr. E.D. Okla. 2007). A subsequent prosecution revealed that the owner of the funeral home had diverted millions of dollars from pre-need funeral trust accounts and had used the money to purchase shares in hedge funds and to finance the operations of another company in which he held an interest. *Id*. at 812-13; *see generally* GAO Report at 55-60 (describing Forest Hill and other civil and criminal fraud suits). Maryland appears to have experienced isolated instances of fraud as well, including a March 2007 federal grand jury indictment of the owner-operator of a Baltimore funeral home for allegedly defrauding Maryland consumers of $525,000 in pre-paid funeral expense accounts. Md. Dep't of Legis. Services, Office of Policy Analysis, *Sunset Review: Evaluation of the State Board of Morticians and Funeral Directors* at 21-22 (Oct. 2007).

*Maryland Law*

Maryland first enacted legislation pertaining to pre-need funeral contracts in 1969. *See* 1969 Md. Laws, ch. 684. The 1969 enactment contained many of the same provisions that exist under current law. *See* Md. Ann. Code art. 43, § 366A (1965 Repl. Vol., 1969 Cum. Supp.).[3] Those provisions now define a pre-need funeral contract as "an agreement between a buyer and a licensed funeral director, licensed mortician, or surviving spouse[4]

---

[3] In 1981, the law was re-codified into the Health Occupations Article ("HO"), *see* 1981 Md. Laws, ch. 8, and in 1992 it was re-numbered at its current location within HO § 7-405, *see* 1992 Md. Laws, ch. 155. In 1999, the law was expanded to authorize the use of insurance proceeds to fund pre-need contracts. *See* 1999 Md. Laws, ch. 578; *see generally* 80 *Opinions of the Attorney General* 188 (1995) (describing the history of how Maryland has regulated pre-need contracts for funeral services and burial services).

[4] A surviving spouse of a licensed mortician may obtain a license to continue the business under the supervision of another licensed mortician. HO § 7-308; 1981 Md. Laws, ch. 184. As we have previously observed, the availability of a surviving spouse license

(continued. . . .)

to provide any goods or services purchased prior to the time of death."  HO § 7-101(v).  Two types of pre-need funeral contracts are relevant here:  money-trusted and insurance-funded.  In a money-trusted pre-need contract, the buyer selects certain goods and services and pre-pays the "total price" of those goods and services based on the prices then in effect.[5]  The money that the buyer pays under the contract must be deposited into a federally-insured, interest-bearing trust or escrow account.  HO § 7-405(d)(2).  The only exception to the trusting requirement allows the seller to retain for its own use 20 percent of the selling price of the casket or casket vault.  HO § 7-405(d)(1)(ii)1.  The money in the account may not be withdrawn by the seller prior to performance and must be refunded to the buyer upon written demand at any point prior to the seller's performance of the contract.[6]  The interest or dividends generated on the account

---

"recognizes and preserves the value to a mortician's family of the funeral home as a going concern" and "affords the community a measure of continuity in the operation of the funeral home by one presumably familiar with the business."  72 *Opinions of the Attorney General* 141, 145-46 (1987).

[5]  Although the contract must state the "total price" of the agreed-upon goods and services, the statute does not require that the price be paid at one time.  Sellers often allow buyers to pay in installments, but with interest.  *See* S.B. 578, 1999 Leg., Reg. Sess., Hearing Before the Senate Finance Comm. (March 2, 1999) (written testimony of Sen. Delores G. Kelley).  If the beneficiary dies before the entire contract amount has been paid, the seller may consider the contract void, in which case the beneficiary's heirs are entitled to a refund of "all payments and interest held for the buyer."  HO § 7-405(e)(3)(iv); *see also infra* n.6 (describing refund provisions).

[6]  The statute allows the buyer to terminate the contract at any time by demanding in writing "a refund of all payments made," HO § 7-405(e)(3)(i), at which point the seller must refund "all payments and interest held for the buyer."  HO § 7-405(e)(3); *see also* COMAR 10.29.06.06C.  Although 20 percent of the purchase price of the casket is not deposited into the trust account and is, therefore, arguably not "held for the buyer," it is our understanding that the Board interprets the statute and regulations such that *all* of the payments made under a pre-need contract are "held for the buyer" in the sense that they must be put toward the cost of the funeral services ultimately provided.  Under the Board's interpretation of the statute and regulations it administers— an interpretation that is entitled to "considerable weight," *Motor Vehicle Admin. v. Carpenter*, 424 Md. 401, 413 (2012) (quoting *Maryland Aviation Admin. v. Noland*, 386 Md. 556, 571-72 (2005))—

(continued. . . .)

"belong to" the buyer until the beneficiary dies and the agreed-upon goods and services have been provided, at which point the seller may withdraw the money from the account and keep "any interest or dividends earned." HO § 7-405(d)(4)(ii).

An insurance-funded pre-need contract provides for the same services as a money-trusted contract but is funded by assigning to the seller the benefits of a life insurance policy or annuity contract. *See generally* HO § 7-405(f). As with a money-trusted contract, the buyer may unilaterally terminate an insurance-funded contract at any time, here by revoking the assignment of benefits. HO § 7-405(f)(3)(i)2, (f)(3)(ii). Unlike a money-trusted contract, however, an insurance-funded contract does not entitle the buyer to a refund of the purchase price of the insurance policy in the event the buyer revokes the assignment of benefits. Rather, the insurance policy remains in place and is governed by insurance law, not the provisions of § 7-405. HO § 7-405(f)(3)(iii)2.[7] Another significant difference between money-trusted and insurance-funded pre-need contracts is that, under an insurance-funded contract, if the benefit amount under the insurance policy exceeds the "total price" of the funeral goods and services "as determined at the time of death of the insured," the excess benefits "are paid to the beneficiary under the life insurance policy or annuity contract." HO § 7-405(f)(3)(i)4.[8]

---

the buyer is entitled to a refund of all payments made under the contract.

[7] The buyer who wishes to terminate the underlying life insurance policy may be able to surrender the policy, but likely will receive in return something less than its face value. *See* National Funeral Directors Association, *Model Consumer Protection Guidelines for State Preneed Funeral Statutes* at 4 (as amended Oct. 6, 2007) (*available at* http://www.nfda.org/additional-tools-preneed/258-nfda-model-consumer-protection-guidelines-for-state-preneed-funeral-statutes.html (last visited Feb. 27, 2013)).

[8] Maryland law provides for a third type of pre-need contract, which is also money-trusted, but involves the formation of an *irrevocable* trust to hold any portion of the contract amount until it is needed to pay for funeral goods and services upon the beneficiary's death. The formation of an irrevocable trust is allowed "only for the purpose of entitling the buyer to be eligible for any current Social Security benefits or for any benefits under any other plan that restricts eligibility to those with limited assets." HO § 7-405(e)(4)(i). Unlike ordinary money-trusted pre-need contracts, the use of an irrevocable

(continued. . . .)

As you state in your letter, it is a common practice within the funeral industry to include provisions in money-trusted pre-need contracts that require the surviving family members of the deceased to "make up the difference" between the contract price of the agreed-upon goods and services and the price of the goods and services at the time of death. Such contracts are known within the industry as "non-guaranteed contracts." *See* Tergesen at 1. The question you have asked is whether sellers may include non-guaranteed price provisions in money-trusted pre-need contracts or must instead accept the contract price as payment in full.

## II

## Analysis

We are called upon here to construe the provisions of § 7-405 of the Health Occupations Article, mindful that "[t]he ultimate goal in construing and applying a statute is to 'discern the actual intent of the [L]egislature in enacting it.'" *Ali v. CIT Tech. Fin. Servs.*, 416 Md. 249, 260 (2010) (quoting *Chow v. State*, 393 Md. 431, 443-44 (2006)). When the Legislature's intent is plain from the language used, we "need not delve deeper." *Ali*, 416 Md. at 260; *see also Bourgeois v. Live Nation Entm't*, —Md.—, 2013 Md. LEXIS 10, 16 (Jan. 18, 2013) ("If the language is clear and unambiguous, we need go no further."). However, even when the statute's meaning may appear plain, we may "look at the purpose of the statute and compare the result obtained by use of its plain language with that which results when the purpose of the statute is taken into account." *Kramer v. Liberty Prop. Trust*, 408 Md. 1, 19 (2009). If, after considering the statutory language in its proper context, "we conclude that the statute is subject to more than one interpretation or that relevant terms are otherwise ambiguous, we endeavor to resolve the ambiguity by looking to the statute's legislative history, purpose, and structure, as well as to case law." *Bourgeois*, 2013 Md. LEXIS at 17. Legislative history "may be considered in an effort both to confirm what appears to be a clear intent from the language itself and to discern legislative intent when that intent is not entirely clear from the statutory language." *Id.* We may also look to the interpretation of a statute by the agency that administers it, as courts will accord a degree of deference to the agency's interpretation. *Dep't of*

---

trust means that the buyer "may not receive a refund of any payments made for the pre-need burial contract." HO § 7-405(e)(4)(ii).

*Human Res. v. Hayward*, 426 Md. 638, 650 (2012); *Marzullo v. Kahl*, 366 Md. 158, 172 (2001).

### A. *Section 7-405 of the Health Occupations Article Requires that the Pre-Need Contract Reflect the "Total Price" of the Agreed-Upon Goods and Services*

Section 7-405 of the Health Occupations Article governs the form and content of pre-need contracts. It expressly provides that money-trusted pre-need contracts must contain a "description of any service or merchandise to be provided under the pre-need contract," HO § 7-405(c)(1)(ii), and must disclose "[t]he total price of the services and merchandise agreed on." HO § 7-405(c)(1)(iv). Non-guaranteed price terms, by definition, do not disclose the "total price"; assuming typical inflationary pressures, they disclose only a *portion* of the price, with the balance to be paid at the time of the beneficiary's death, when the seller asks the survivors to "make up the difference" between the contract price and the prevailing market price. Because non-guaranteed contract terms do not contain the "total price" of the goods and services agreed upon, we believe the plain language of § 7-405 prohibits their inclusion in money-trusted pre-need contracts.

Our conclusion finds support in the different manner in which the statute addresses insurance-funded pre-need contracts. Although both types of pre-need contract must include the "total price" as a contract term, *see* HO § 7-405(c)(1)(iv), *see also* HO § 7-405(f)(3)(iii)2 (exempting insurance-funded contracts from subsections (d) and (e), but not (c)), the statute specifies that, for purposes of determining the amount of refund potentially due the buyer,

> [a]ny benefits payable under the life insurance policy or annuity contract in excess of the amount necessary to pay the total price, *as determined at the time of death of the insured*, of the services and merchandise agreed on in the pre-need contract are paid to the beneficiary under the life insurance policy or annuity contract.

HO § 7-405(f)(3)(i)4 (emphasis added). This provision, added to the statute in 1999, expressly applies only to insurance-funded pre-need contracts. 1999 Md. Laws, ch. 578. The Legislature did not include a similar provision within the portion of the statute governing money-trusted pre-need contracts. Had it done so, the

statute would fairly clearly have allowed non-guaranteed price provisions because the total price of the contract would consist of the price paid at the time of contract formation, supplemented by the balance due "at the time of death."

As a matter of statutory construction, we presume that the Legislature's decision to include the phrase "at the time of death" in the provisions governing insurance-funded contracts, but not money-trusted contracts, was intentional. The Latin maxim is "*expressio (or inclusio) unius est exclusio alterius*, or the expression of one thing is the exclusion of another." *Potomac Abatement, Inc. v. Sanchez*, 424 Md. 701, 712 (2012); *see* 87 *Opinions of the Attorney General* 66, 74 (2002); *see also Schisler v. State*, 394 Md. 519, 594-95 (2006) (express provision for legislative approval of executive power to terminate executive officers in § 10 of the Constitution suggests that its absence in § 15 was intentional); *Chow*, 393 Md. at 457-58 (Legislature's use of the term "loan" within statute regulating the registration of machine guns suggests that its failure to include term within subsequent statute regulating handguns was deliberate); *Mossburg v. Montgomery County*, 329 Md. 494, 505 (1993) ("This court has regularly held that where the Legislature in a statute expressly authorizes a particular action under certain circumstances, the statute ordinarily should be construed as not allowing the action under other circumstances.").[9]

Other aspects of the statutory scheme compel the same conclusion we reach through application of the plain language of

---

[9] We note that the statutory provisions governing pre-need *burial* contracts use somewhat different language to describe the price provisions of such contracts. Where pre-need funeral contracts must include the "total price of the services and merchandise agreed upon," HO § 7-405(c)(1)(iv), pre-need burial contracts must contain "the amount of the buyer's financial obligation." Md. Code Ann., Bus. Reg. § 5-704(a)(5). We believe the two provisions are capable of equivalent construction and, thus, ascribe little substantive significance to the different terms employed. Bus. Reg. § 5-704(a)(5). But even if the choice of different terms could be seen as evidence of legislative intent that the two provisions be interpreted differently, we conclude that the different language employed within the Morticians' and Funeral Directors Act reveals more about legislative intent than that contained in a different Article, and that the contrast between the price provisions governing insurance-funded and money-trusted contracts makes clear that money-trusted contracts must contain the "total price" of the agreed-upon services and merchandise without mark-up at the time of death.

the statute and interpretive canons. Disclosure of the principal contract terms is a central provision of the Maryland statute, just as it is central to the federal regulations that govern pre-need contracts generally. *See* HO § 7-405(c)(1); *see generally* 16 C.F.R. Part 453. As we interpret the "total price" requirement of § 7-405(c), buyers are able to ascertain their entire financial responsibility at the time they enter into the pre-need contract, regardless of how the contract is funded. Under money-trusted contracts, the buyer is responsible for the "total price" stated in the contract; under insurance-funded contracts, the buyer is responsible for the face value of the insurance policy, since the seller is required to "accept the benefits payable under the life insurance policy or annuity contract as payment in full." HO § 7-405(f)(3)(i)3. Either way, the buyer enters into the contract knowing that her survivors will not have to pay more than the "total price" reflected in the contract.

It is also important here to recognize that, even where the statute allows for the price in an insurance-funded pre-need contract to be determined "at the time of death of the beneficiary," it does so only for the purpose of determining whether money should be *refunded* to the beneficiary. *See* HO § 7-405(f)(3)(i)4 ("Any benefits payable under the life insurance policy or annuity contract in excess of the amount necessary to pay the total price, as determined at the time of death of the insured, . . . are paid to the beneficiary. . . ."). Thus, while the beneficiary might or might not receive excess money from the seller, under no circumstances does the price-at-time-of-death provision operate to require the survivors to pay more. In this respect, then, the interpretation we reach achieves what we see as a critical consumer protection component of the statute, namely, that a buyer knows *up front* what his or her financial outlay will be.

### B. Legislative Purpose and History Support the Conclusion that the Price Provisions of Pre-Need Funeral Contracts Must be Guaranteed

The General Assembly's stated purpose for enacting the predecessor to § 7-405 was to "regulate and restrict" pre-need funeral contracts, 1969 Md. Laws, ch. 224 at 1522, and a previous version of the statute was reported as "ostensibly designed to protect the deceased and bereaved from burial fraud." *Undertakers Fight Cemeterians*, Baltimore Sun, March 10, 1967, at C12; *see also* 80 *Opinions of the Attorney General* at 189 ("The Maryland Morticians Act carefully regulates pre-need

contracts."). It is fairly self-evident that the Maryland pre-need statute, as with similar statutes in other states, constitutes remedial legislation intended to protect consumers. *See* Letter from Jack Schwartz and Harry Matz, Assistant Attorneys General, to Robert C. Adams, President, Board of Morticians at 4, 5 (Feb. 16, 1990) (Maryland pre-need statute is designed to "protect[] the public" and "consumers"); *see also*, *e.g.*, *Guardian Plans v. Division of Ins.*, 793 P.2d 615 (Colo. Ct. App. 1990) ("The pre-need statutes were enacted to protect the public from unconscionable dealings regarding the sale of pre-need contracts."); *State ex rel. McGraw v. Combs Servs.*, 526 S.E.2d 34, 41 (W.Va. 1999) (stating that the "Legislature's desire to protect purchasers of pre[-]need funeral contracts from unscrupulous purveyors thereof is further evidenced by its establishment of the Pre[-]need Guarantee Fund, which ensures that consumers receive the benefit of their contracted-for bargain"); *compare* H.B. 1090, 2008 Leg., Reg. Sess., Revised Fiscal and Policy Note (enactment of Family Security Trust Fund—now codified at HO §§ 7-4A-01 to 7-4A-13—allows for claims when "pre[-]need money is obtained from a person by theft, embezzlement, false pretenses, or forgery").

Although little legislative history surrounds the 1969 enactment of Maryland's pre-need statute, hearing testimony on the 1999 amendments that authorized the use of insurance-funded pre-need contracts reflects the understanding—held by legislators and industry representatives alike—that one of the principal consumer benefits of pre-need contracts is that they allow the buyer to "lock in" the contract price. Senator Della repeatedly asked whether S.B. 578, if adopted, would allow buyers to "lock[] in" the purchase price under an insurance-funded pre-need contract in the same manner as they could under the money-trusted option then available. S.B. 578, 1999 Leg., Reg. Sess., Hearing Before Senate Finance Comm. (audio recording, Mar. 2, 1999) (statement of Sen. Della begins at the 37:50 time mark); *see also id.* at 39:00 (asking whether consumer would be able to lock in current prices "regardless of what the cost might be 20 years down the road"). David Funk, the representative of an insurance company planning to enter the market, replied in the affirmative, *id.* at 38:05, as did all of the other witnesses who addressed the issue. Among them were John P. Chaplin—then President of the Board of Morticians—who testified that pre-need contracts allow the buyer to "lock in the price of the funeral and not have to pay any more for it," *id.* at 6:15, and Erich W. March—representing the Funeral Directors Association, and a former President of the Board of Morticians—who testified that, as a funeral director, "if [the contract price is] less than the funeral in the future, I've

guaranteed the contract; I'm the loser." *Id*. at 51:35.

Mr. March's comments on behalf of the Funeral Directors Association are consistent with statements the Association has made in connection with a Board-approved online course designed to educate morticians about the basics of the Maryland pre-need statute. In those course materials the Association advises morticians, "Once a pre-need contract has been funded and signed, the prices on the contract are guaranteed." Maryland State Funeral Directors Assn., *How Much Do You Know About Maryland's Pre-need Statute?* at 5, http://www.msfda.net/ sitemaker/sites/Maryla1/images/WebsitePreneedMDStatuteOnlin eCourse01-2010.pdf (last visited Feb. 27, 2013). These statements confirm what the language of the statute otherwise makes plain: The requirement that money-trusted pre-need contracts reflect the "total price" of agreed-upon goods and services does not allow for sellers to ask surviving family members to make up the difference between the contract price and the market price at the time the services are rendered.

### C. The Board's Administrative Construction of the Statute is Consistent With the Conclusion that the Seller May Not Charge Survivors More at the Time of Death

The Board's regulations do not elaborate on the "total price" requirement. Instead, the regulations provide only that "[t]he seller shall perform the contract according to the contract's terms and at the agreed upon price"—a regulatory construction that we believe sheds little light on the meaning of the statutory phrase. There is, however, one way in which the regulations suggest strongly that the price terms of money-trusted pre-need contracts must be guaranteed. Generally, the Board re-states the statutory list of circumstances that provide grounds for termination of the pre-need contract, *see* HO § 7-405(e)(3), but it has added language to the third such circumstance: "The seller is unable to perform under the terms and conditions of the pre[-] need contract *for reasons other than an increase in the cost of goods and services . . . .*" COMAR 10.29.06.06C(3) (emphasis added).

The Board's addition of the italicized language makes clear that a seller may not terminate a pre-need contract on the grounds that the prevailing market price has outstripped the contract price—a circumstance that would be of concern to the seller principally if the contract price is guaranteed. If the price were not guaranteed, and the seller were able to collect the prevailing rates at the time of death, the seller would have no need to terminate the contract because of "an increase in the cost of goods

and services," and there would have been no need for the Board to prohibit the practice. Nor can we discern the policy goals that would be advanced by prohibiting the seller from terminating the pre-need contract on price grounds *prior* to the beneficiary's death—as the Board's regulations do—while allowing the seller to do so *afterwards*. That would, we think, defeat a fundamental purpose of the pre-need contract, which is to allow the buyer to bind the seller and thereby obtain a measure of control over his or her own funeral. And yet, that is precisely the scenario that would arise if the seller were able to require the beneficiary's survivors to "make up the difference" or go elsewhere for funeral services. *Cf. Bourgeois*, 2013 Md. LEXIS at 35-36 (concluding that the addition of an "'authorized service charge," if allowed, would "essentially eviscerate[]" the ordinance's requirement that the ticket not be sold for more than the "established price" printed on it). Our interpretation thus accords with that of the Board.[10]

### D. Allowing Non-Guaranteed Pre-Need Contracts Would Alter the Economic Incentives of the Contracting Parties in a Manner that is Inconsistent with the Consumer Protection Purpose of the Statute

Our reading of the "total price" requirement also finds support in the fact that it preserves what we perceive to be the economic incentive structure embodied within the money-trusted pre-need contract. Although buyers likely pre-plan funeral arrangements primarily to spare their survivors inconvenience and expense, money-trusted pre-need contracts also provide buyers a

---

[10] We are aware that the Board has previously reviewed and approved contract forms that include separate provisions for guaranteed and non-guaranteed price terms. It is our understanding, though, that the forms the Board approved were for insurance-funded pre-need contracts, which, as discussed above, are subject to different "total price" provisions. Given that the price of goods and services under insurance-funded contracts is "determined at the time of death of the insured," HO § 7-405(f)(3)(i)4, the same concerns that weigh against allowing non-guaranteed price terms in money-trusted pre-need contracts do not necessarily apply to insurance-funded contracts. The statute expressly provides, though, that the seller must "accept the benefits payable under the life insurance policy or annuity contract as *payment in full* for the services and merchandise agreed on in the pre-need contract." HO § 7-405(f)(3)(i)3 (emphasis added). Accordingly, the seller may not require additional payment for the agreed-upon goods and services, and may not retain any portion of the assigned benefits that exceeds the total price of the goods and services "as determined at the time of death of the insured." HO § 7-405(f)(3)(i)4.

means of protection against the effect of inflation on the price of funeral goods and services. By paying the "total price" for goods and services at the time of contract, buyers lock in the price of those goods and services at then-prevailing rates and eliminate any uncertainty about the kind of funeral they could afford in the event that costs have increased by the time of death. *See*, *e.g.*, *Coleman & Coleman Enters. v. Waller Funeral Home*, 2012 Miss. LEXIS 570, *3 (Nov. 15, 2012) ("The purpose of these pre[-]need [funeral] contracts was to fix the price of funeral services and merchandise, so the customer could avoid the risk of inflation."); *Utah Funeral Dirs. & Embalmers Ass'n, v. Memorial Gardens of the Valley*, 408 P.2d 190, 195 (Utah 1965) (observing that, in contrast to insurance, where the benefits paid out may far exceed the premiums paid, in pre-need funeral contracts "the amount to be paid on the contract is fixed by its terms" and "[t]he only possible profit or benefits which could accrue to the purchasers under these contracts would be a possible raise in the price of such services specified after the contract was entered into"). Sellers make the opposite calculation. Because, "[u]pon performance of the contract, any interest or dividends earned by the escrow or trust account belong to the seller," HO § 7-405(d)(4)(ii), the seller stands to profit whenever the amount of money deposited in the trust or escrow account, including accrued interest, exceeds the price of the agreed-upon goods and services at the time of death.[11]

Allowing sellers to include non-guaranteed price terms within money-trusted pre-need contracts would materially alter this incentive structure in a way that insulates the funeral service provider from all risk. If interest rates outstrip inflation, the seller is entitled to keep the excess; that much is dictated by § 7-405(d)(4)(ii). But if the inflation outstrips interest, the seller would be able, under a non-guaranteed contract, to require family

---

[11] We note also that sellers obtain other financial benefits from pre-need contracts. Although a seller must place the vast majority of the contract price into escrow and may not withdraw that money until the beneficiary dies and the seller provides the agreed-upon services and merchandise, HO § 7-405(e)(2), the seller is entitled to use as operating capital 20 percent "of the selling price of a casket or casket vault under the pre-need contract," HO § 7-405(d)(1)(ii), which can amount to hundreds of dollars in today's market. *See* Sara J. Marsden, *Points to Consider When Buying a Funeral Casket*, US Funerals Online, http://www.us-funerals.com/caskets.html (last visited Feb. 27, 2013) (cost of casket ranges from $1,000 to $3,000, with high-end models in the tens of thousands of dollars).

members to "make up the difference" between the contract price and the price at the time of death. The buyer, by contrast, would bear *all* of the risk associated with inflation.[12]

Allowing non-guaranteed price provisions would have other anti-consumer effects that we believe the Legislature did not intend. For example, one of the reasons why buyers enter into pre-need contracts is to spare their loved ones the burden and expense of having to arrange a funeral during a time of grief. This important purpose of pre-need funeral planning would be defeated, at least in part, if the seller may nevertheless require that surviving family members "make up the difference" between the contract price and the price at the time of death.[13]

We see nothing in the language of the statute or its legislative history to suggest that the Legislature intended such anti-consumer outcomes. In the absence of such intent, canons of statutory construction require that we interpret § 7-405 "liberally in order to promote its [consumer protection] purpose." *Washington Home Remodelers v. State*, 426 Md. 613, 630 (2012) (noting that Consumer Protection Act, as remedial legislation, requires liberal construction); *see also Maryland Ins. Comm'r v. Central Acceptance Corp.*, 424 Md. 1, 39 (2011). Reading § 7-405 in a manner that would prohibit sellers from shifting the risk of inflation entirely onto the buyer or his survivors advances that purpose, is consistent with the available legislative history, and gives effect to the plain language of the statute.

---

[12] As one article explains, pre-need contracts typically involve a trade-off: "With a so-called guaranteed plan, a funeral home promises that if you pay today's prices, it will provide the goods and services you purchased, no matter how much prices rise. 'Non-guaranteed' plans offer no such protections. But if these accounts appreciate in value, heirs get to keep the gains." Tergesen at 1.

[13] If the price difference were too great, the surviving family members, through the "legal representative of the buyer," HO § 7-405(e)(3)(i), may be able to terminate the contract and receive a refund of "all payments and interest held for the buyer," HO § 7-405(e)(3), if they do so before the seller actually provides the agreed-upon services and merchandise. *See* HO § 7-405(e)(2)(i) (prohibiting seller from withdrawing funds until contract is performed). We suspect, though, that the prospect of having to make alternative funeral arrangements under such trying circumstances would present a significant obstacle to termination.

### E. *The Regulation of Pre-Need Funeral Contracts in Other States*

Although we have not completed a comprehensive survey of state provisions, we recognize that our conclusion places Maryland in the minority of states that prohibit non-guaranteed pre-need contracts. Most states allow non-guaranteed provisions in pre-need contracts, but do so expressly, with statutory or regulatory language that requires the pre-need contract to disclose whether a particular good or service is guaranteed. *See*, *e.g.*, Va. Code Ann. § 54.1-2820(A)(4) (2013) (prohibiting a pre-need contract unless it "clearly discloses whether the price of the supplies and services purchased is guaranteed"); Minn. Stat. § 149A.97.3a(3) (2012) (requiring that pre-need contract "disclose[] clearly and conspicuously whether the prices of the goods and services selected are guaranteed"); Tenn. Code Ann. § 62-5-406(b)(3) (2013) (pre-need contracts must "clearly identify whether the contract is a guaranteed pre-need funeral contract or a non-guaranteed pre-need funeral contract"); La. Rev. Stat. Ann. § 37:862(A)(11) (2012) (pre-need contracts must "specifically identify which funeral goods and services are guaranteed funeral goods and services"); Mich. Comp. Laws § 328.220 (2012) ("All prepaid contracts provided for under this act shall be either a nonguaranteed price contract or a guaranteed price contract and shall be made and executed pursuant only to this act.").

Maryland is not, however, alone in prohibiting non-guaranteed price provisions. Utah does so, requiring that pre-need contracts "clearly identify that the contract is a guaranteed product contract," Utah Code Ann. § 58-9-701(2)(c) (2012), "wherein goods or services are selected which will be provided at the time of need for the consideration specified in the contract regardless of the market price at the time of need." Utah Admin. Code R156-9-102(3) (2013) (defining "guaranteed product contract"). Arkansas does so too; "all contracts for sale of prepaid funeral benefits shall provide that the seller shall furnish to the buyer the merchandise and services as set forth in the contract at the contract price, regardless of the cost of the merchandise or services at the date of the beneficiary's death." Ark. Code Ann. § 23-40-112(d)(1) (2012); *see also* Haw. Rev. Stat. § 441-22.5(c) (2012) ("No mortuary, cemetery, or pre-need funeral authority shall charge a price for the cemetery property, interment, or funeral services, whether it be at-need or pre-need, which is *greater than the price on the itemized price list or contract which the purchaser had signed . . . .*") (emphasis

added). As with the states that allow non-guaranteed price terms, though, the states that prohibit such terms generally do so expressly.

Maryland and Nevada are the only two states that appear to lie in the middle, with statutory provisions requiring that pre-need contracts include the "total price" or the "purchase price," but without expressly permitting or prohibiting non-guaranteed price provisions. *See* Nev. Rev. Stat. § 689.275(1)(c) (2012) ("All forms for a prepaid contract offered or sold in this state must contain . . . the purchase price of each item of supply or service and how payable."). Although we have found no Maryland or Nevada cases construing the price provisions of their respective state's pre-need statutes, a Colorado case—*Guardian Plans v. Div. of Ins.*, 793 P.2d 615 (Colo. Ct. App. 1990)—construed an analogous provision of Colorado law to reach the same conclusion we reach here.

In *Guardian Plans*, the Colorado Court of Appeals heard the appeal of a funeral home that had its license suspended in part because its pre-need contracts contained non-guaranteed price terms. *Id.* at 616. The Division of Insurance had determined that such terms violated Colorado's pre-need statute because they did not "set forth the purchase price and the terms under which it is to be paid." *Id*. at 618.[14] The funeral home argued that "the Division misconstrued and misapplied the pre-need statute by requiring it to state a 'fixed price' or 'purchase price' for funeral goods and services," and that its contracts, which listed "a price that is 'subject to change from time to time,'" complied with the statutory requirements. *Id.* at 617-18.

The court upheld the suspension. In reaching the conclusion that non-guaranteed price provisions did not constitute a "purchase price," the Colorado Court of Appeals emphasized the importance of the disclosure within the statutory scheme:

> The pre-need statutes were enacted to protect
> the public from unconscionable dealings

---

[14] The Colorado statutory provision at issue in *Guardian Plans*—Colo. Rev. Stat. § 10-15-109(1) (1987 Repl. Vol. 4A)—has since been amended and recodified and now requires that pre-need contracts "[s]pecify the services or merchandise, or both, to be provided, and clearly indicate that the pre[-]need contract seller guarantees and fully pays for each such service or merchandise, or both, when it is provided . . . ." Colo. Rev. Stat. § 10-15-105(g) (2012).

> regarding the sale of pre-need contracts. The General Assembly has developed detailed disclosure requirements designed to provide meaningful protection to consumers. Accordingly, listing a price that is "subject to change" would render the statutory disclosure requirement meaningless and would provide the consumers with little useful information about the pre-need contract price.

*Id*. at 618. "Consequently," the court concluded, "we agree with the trial court's judgment holding that the plaintiff sold funeral goods and services on a pre-need basis without properly disclosing the price of those goods and services as required by statute." *Id*.

We believe the same reasoning applies to Maryland's pre-need law, which similarly includes detailed disclosure requirements concerning the types of goods and services to be provided and the "total price" thereof. *See* HO § 7-405(c)(1). The purpose of requiring the seller to disclose the "total price" that the buyer will have to pay, it would seem, is to ensure against the eventuality that generated this opinion, namely, that the funeral home would seek to increase the contract price once the beneficiary dies. Indeed, as discussed above, that practice is precisely what led to one of the most widely-reported fraud prosecutions involving pre-need contracts to date. *See In re Forest Hill*, 364 B.R. at 815 (describing fraudulent practices of Forest Hill, which refused to honor the terms of pre-need contracts and imposed additional charges).

In fact, we believe that the "total price" requirement set forth in § 7-405(c)(1)(iv) presents an easier case than the "purchase price" language at issue in *Guardian Plans*. While a non-guaranteed price may still plausibly qualify as the "purchase price," it cannot, by definition, disclose the *total* price of an agreed-upon service or merchandise; it discloses only a *portion* thereof, with the balance to be paid at the time of the beneficiary's death. We conclude, then, that Maryland law prohibits the inclusion of non-guaranteed price terms within money-trusted pre-need contracts.

This is not to say that the statute requires the seller to bind itself to guaranteed price provisions for *all* of the funeral goods and services expected to be necessary at the time of death. To the

contrary, the statute expressly allows—actually, requires—sellers to "[s]tate[] that all funeral costs may not be covered under the pre-need contract," HO § 7-405(c)(1)(iii)1, and to list in the pre-need contract "all funeral goods and services that are reasonably expected to be required at the time of need, but are not included in the contract." HO § 7-405(c)(1)(iii)2. Thus, if a seller does not wish to run the risk that inflation will outstrip interest rates for caskets, embalming, or other goods and services, it may simply exclude those goods and services from the contract and inform the buyer that they are excluded. But if the seller includes goods and services in a money-trusted contract, and requires payment under the contract for those goods and services, the contract price for those goods and services must be guaranteed.

### III

### Conclusion

In our opinion, the requirement of § 7-405 of the Health Occupations Article that money-trusted pre-need contracts include the "total price" of the agreed-upon goods and services means that the price terms of the contract must be guaranteed. Although the contract may include estimated prices for the goods and services that are not included under the contract, the licensed mortician or funeral director may not accept pre-payment for such goods and services.

Douglas F. Gansler
*Attorney General*

Adam D. Snyder*
*Chief Counsel,
  Opinions & Advice*

* Linda Zang, a volunteer intern in the Opinions and Advice Division, contributed substantially to the preparation of this opinion.